ASSOCIATED BUILDERS AND CONTRACTORS, INC., SOUTHERN NEVADA CHAPTER, A NEVADA NOT-FOR-PROFIT CORPORATION; AMERICAN ASPHALT & GRADING COMPANY, A NEVADA CORPORATION; RICHARD C. KEHRES, INDIVIDUALLY; AND JESSE J. PIPKIN, INDIVIDUALLY, APPELLANTS, v. SOUTHERN NEVADA WATER AUTHORITY, A NEVADA POLITICAL SUBDIVISION, RESPONDENT.

No. 30535

June 7, 1999

979 P.2d 224

---

*Hunterton & Associates* and *Thea Marie Sankiewicz*, Las Vegas, for Appellants.

*Stewart L. Bell,* District Attorney, Clark County; *Haney, Woloson & Mullins,* Las Vegas; *Charles K. Hauser,* General Counsel, Southern Nevada Water Authority, Las Vegas; *Morgan, Lewis & Bockius* and *Bradford W. Coupe* and *James P. Philbin,* New York, New York, for Respondent.

*McCracken, Stemerman, Bowen & Holsberry,* Las Vegas; *Sherman, Dunn, Cohen, Leifer & Yellig, P.C.,* and *Victoria L. Bor,* Washington, D.C., for Amici Curiae Building and Construction Trades Department, AFL-CIO, and Building and Construction Trades Council of Southern Nevada.

*Hicks & Walt* and *Neil M. Alexander* and *James T. Winkler,* Reno, for Amici Curiae the National Association of Manufacturers and the United States Chamber of Commerce.

## OPINION

*Per Curiam:*

This suit arises from respondent Southern Nevada Water Authority's (Water Authority) adoption of a project labor agreement (PLA). Appellant American Asphalt bid on a Water Authority project, noting that it would not comply with the PLA, and its bid was rejected. Thereafter, appellants Associated Builders and Contractors and American Asphalt, along with two individual American Asphalt employees, filed a suit in district

court. The district court upheld the validity of the PLA. This appeal followed.

## FACTS

In 1993, the United States Supreme Court held that federal law would not pre-empt a state authority from enforcing a PLA requirement. Building and Constr. Trades Council v. Associated Builders and Contractors of Mass./R.I., Inc., 507 U.S. 218 (1993). Thereafter, on April 14, 1994, former Nevada Governor Robert Miller issued an executive order directing all state boards, authorities, and agencies to provide for the negotiation of PLAs in public works contracts unless the board, authority, or agency makes a written determination that the benefits of proceeding without a PLA exceed the benefits of a PLA.

A PLA is an agreement between a construction project owner and a labor union that a contractor must sign in order to perform work on the project. The union is designated the collective bargaining representative for all employees on the project and agrees that no labor strikes or disputes will disrupt the project. The contractor must abide by certain union conditions, such as hiring through union hiring halls and complying with union wage rules.

In late 1994, the Southern Nevada Water Authority determined it was not bound by the Executive Order. The Water Authority is a political subdivision of the State of Nevada created to address the water needs of southern Nevada residents on a regional basis. Pursuant to an agreement entered into by the Clark County municipal water and sewer districts and the urban cities of Clark County, the Water Authority is empowered to acquire, develop, and maintain water supplies for the benefit of southern Nevada consumers. Included in the agreement is the preparation and implementation of the Capital Improvements Plan, which is committed, over a thirty-year period, to developing a reliable and demand-responsive municipal water system to supplement the existing system. The immediate objective is the ''1999 Facilities'' phase, which involves work on water distribution facilities.

In 1993, the Water Authority awarded a contract to Ralph M. Parsons Company (Parsons) for program management of the Capital Improvements Plan. The contract specifies that Parsons is responsible for planning, design management, environment and construction management, and start-up services.

After PLAs were brought to the Water Authority's attention in late 1994, Douglas Selby, the Water Authority's Director of Engineering, asked Patricia Mulroy, the Water Authority's General Manager, if she wanted to pursue using a PLA. Although

the Water Authority began to investigate the use of PLAs, Mulroy stated that she was not ready to recommend the use of a PLA to the Water Authority board. In the spring of 1995, Mulroy learned of two labor strikes against a contractor who was working on two Colorado River Commission projects, which were later transferred to the Water Authority. The work stoppages concerned Mulroy, although she was not sure how they affected the projects or their time schedules.

In the fall of 1995, Mulroy decided to seek approval from the Water Authority board to use a PLA on the Capital Improvements Plan. Water Authority officials testified that it was of paramount importance that each phase of the Plan be completed in a timely manner to ensure uninterrupted water delivery to southern Nevadans. The board approved Mulroy's recommendation to begin the development of a PLA. The Water Authority began by meeting with Parsons Constructors Inc., Parsons' construction subsidiary. Selby authorized Parsons to begin informal discussions with union representatives. Before formal negotiations began, the Water Authority adopted a list of goals and objectives. Parsons entered formal negotiations with the Las Vegas building trade unions in January 1996, and a PLA was drafted and executed by participating local and national unions. Parsons did not execute the agreement until it was reviewed and approved by the Water Authority board.

At a March 21, 1996 meeting, the board passed a resolution approving the application of the PLA to the 1999 Facilities phase of the Capital Improvements Plan. The PLA included provisions that prohibited labor disruptions or strikes, named the national unions as the sole and exclusive bargaining representatives of all craft employees, set uniform work hours and overtime rates, provided access to the projects on the Capital Improvements Plan to both union and non-union contractors, and permitted non-union contractors to use up to seven of their core employees selected on a one-to-one basis with employees referred by the union. Although the PLA requires hiring to be supervised out of the union hall, it does not require individuals to join a union in order to work on any of the 1999 Facilities projects. In addition, the resolution passed by the board requires periodic evaluation of the PLA by Water Authority staff in order to determine whether the anticipated benefits of using a PLA have been realized.

The bidding for Water Authority contract number 120-A, a mass excavation project located on the shores of Lake Mead, took place in June 1996. On June 27, 1996, the estimator compiling the bid for American Asphalt called the Water Authority and spoke to the Project Engineering Manager. The estimator told the manager that American Asphalt was going to bid on the project,

but that it would not comply with the PLA if awarded the contract. The estimator inquired whether under those terms, the bid would be rejected. The manager replied that the bid would likely be rejected.

Despite this discussion, American Asphalt submitted its bid for the project on June 28, 1996, along with five union contractors. The bids ranged from $1,509,314 to $1,744,000, with the lowest bid from American Asphalt. American Asphalt was not awarded the bid and the lawsuit resulting in this appeal followed.

As this case involves questions of law, we review the issues de novo. SIIS v. United Exposition Services Co., 109 Nev. 28, 30, 846 P.2d 294, 295 (1993).

### DISCUSSION

Associated Builders argues that the imposition of the PLA violates Nevada's competitive bidding, right to work, and freedom of association statutes. We disagree.

The parties also discussed whether the Water Authority was bound by Governor Miller's Executive Order, and, if not, whether it had jurisdiction to impose the PLA. We hold that, regardless of whether the Water Authority was bound by the executive order, the Water Authority has discretion to adopt a PLA as long as the PLA is not in contravention of Nevada law, as discussed below.

#### Competitive Bidding Statutes

The issue of whether a PLA violates Nevada's competitive bidding statutes is one of first impression before this court. However, three state high courts—New Jersey, New York, and Alaska—have addressed the issue of whether PLAs are valid under their states' competitive bidding laws. *See* Laborers Local No. 942 v. Lampkin, 956 P.2d 422 (Alaska 1998); Tormee Const. v. Mercer County Imp., 669 A.2d 1369 (N.J. 1995); George Harms Const. v. Turnpike Auth., 644 A.2d 76 (N.J. 1994); N.Y. State Chapter v. Thruway Authority, 666 N.E.2d 185 (N.Y. 1996).

The first court to review PLAs in light of competitive bidding laws was the Supreme Court of New Jersey. The court noted that the policy behind the competitive bidding statutes is "to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of *unfettered competition.*" *George Harms,* 644 A.2d at 91 (emphasis added) (quoting Terminal Construction Corp. v. Atlantic County Sewerage Authority, 341 A.2d 327 (N.J. 1975)). The court determined that the PLA at issue violated New Jersey's competitive bidding statutes because the statutes provide that a public

entity cannot specify a sole source of construction services or denote a specific union affiliation. *Id.* at 94. In response to the argument that the bids are open to all bidders, the court noted that a PLA does not represent real competition. *Id.* Although noting that PLAs "serve important purposes on major long-term construction projects," the court concluded that the policy of New Jersey's statutes is to foster unfettered competition and the effect of PLAs is to lessen competition. *Id.* at 95.

The Supreme Court of New Jersey revisited the issue in *Tormee Construction,* after the New York Court of Appeals had addressed the issue. The New Jersey court stated it is "obligated to adjudicate such bid specifications case-by-case" and in this case, again, found the PLA at issue violative of New Jersey's competitive bidding laws. *Id.* at 1373. The court noted that the library project for which the PLA was adopted lacked the size and complexity of a project for which a PLA was upheld by the New York Court of Appeals. *Id.* at 1372.

The New York Court of Appeals had held that:

> PLAs are neither absolutely prohibited nor absolutely permitted in public construction contracts. A PLA will be sustained for a particular project where the record supporting the determination to enter into such an agreement establishes that the PLA was justified by the interests underlying the competitive bidding laws.

*Thruway Authority,* 666 N.E.2d at 187-88. The New York court determined that its competitive bidding statutes did not compel unfettered competition, as the New Jersey statutes did, but instead had two central purposes: (1) to protect the public fisc by obtaining the best work at the lowest possible price; and (2) the prevention of favoritism, improvidence, fraud, and corruption. *Id.* at 190.

The *Thruway Authority* court analyzed two separate instances in which a PLA was used. First, the New York court determined that the PLA used in a project to refurbish the Tappen Zee Bridge was adopted in conformity with competitive bidding laws because: (1) the PLA did not promote favoritism in that it applied whether the successful bidder was union or non-union and discrimination on the basis of union membership was prohibited; and (2) the Thruway Authority focused on the public fisc given the size and complexity of the project and an earlier labor dispute. *Id.* at 191-92. Second, the New York court held that a PLA used on a project to modernize the Roswell Park Cancer Institute was not adopted in conformity with New York's competitive bidding statutes because there was no indication of a discussion of cost

savings prior to approval of the PLA and no indication of a concern about labor unrest. *Id.* at 193.

The third state high court to address PLAs, the Supreme Court of Alaska, addressed the issue of whether a PLA adopted on a high school construction project violated a borough's procurement code, which states that bid specifications should be drafted to "promote overall economy" and "encourage maximum free and open competition." *Lampkin,* 956 P.2d at 432 n.13. The Alaska court noted that the purpose of the procurement code is to prevent fraud, collusion, favoritism, and is for the benefit of taxpayers, not the bidders. The court examined the PLA under a reasonable basis standard and held that the borough had a reasonable basis for adopting the PLA. The project was the largest construction project undertaken by the borough and required flexible scheduling so the school schedule would not be affected. *Id.* at 435.

We hold, following the reasoning of the other state high courts which have reviewed this issue, that PLAs are not absolutely prohibited under Nevada law. A PLA will be upheld if it was adopted in conformity with the objectives of our competitive bidding laws. Therefore, we examine whether the PLA at issue complied with these objectives.

NRS 338.140 provides, in part, that:

> 1. An agency of this state, a political subdivision, municipal corporation or district, a public officer or a person charged with the letting of contracts for the construction, alteration or repair of public works shall not draft or cause to be drafted specifications for bids, in connection with the construction, alteration or repair of public works:
>
> (a) In such a manner as to limit the bidding, directly or indirectly, to any one specific concern.

In addition, NRS 338.147(1) provides that: "[a] public body shall award a contract for a public work to the contractor who submits the best bid."

Further, with respect to bidding procedures, this court has held that:

> The purpose of bidding is to secure competition, save public funds, and to guard against favoritism, improvidence and corruption. Such statutes are deemed to be for the benefit of the taxpayers and not the bidders, and are to be construed for the public good.

Gulf Oil Corp. v. Clark County, 94 Nev. 116, 118-19, 575 P.2d

1332, 1333 (1978). Therefore, we address whether the PLA at issue was adopted in conformity with the interests underlying competitive bidding practices as enunciated in *Gulf Oil,* i.e., to secure competition, save public funds, and guard against favoritism, improvidence, and corruption.

According to the record, providing equal access to projects to both union and non-union contractors, at no disadvantage to non-union contractors, was an issue of concern to the Water Authority when it was developing the PLA. The PLA allows both union and non-union contractors to bid on projects and allows a non-union contractor to hire up to seven core employees. In addition, employees are not required to join the representative union under the PLA. Therefore, we conclude that the PLA maintains competition among bidders and guards against favoritism.

Further, the record indicates that, in this case, a PLA was considered due to concerns about potential labor disputes and a halt to the project, after the Water Authority learned of two strikes that had occurred on the project. Although the record does not indicate specific discussion about saving public funds,[1] labor strikes are an issue which could affect public funds. Furthermore, testimony indicated that the Water Authority was concerned that projects be completed on time in order to ensure an adequate water supply to southern Nevadans. The PLA, under Article I: Purpose, states:

> The Project covered by the Scope of this Agreement . . . is critical to meeting the needs of the increasing population of Las Vegas and the surrounding metropolitan area and to avoiding economic disruption and personal suffering caused by limited water supplies. . . . Requirements for timely completion of the work without interruption or delay and for at-budget completion are vital to the needs of this community.

An obvious concern in adopting the PLA was the cost of a delay if water supplies became limited. Therefore, we conclude that the PLA was focused on saving public funds, albeit indirectly. Based

---

[1]Statistics compiled after the PLA had been adopted indicate that the PLA saved funds and that competition increased. Between the institution of the PLA and March 21, 1997, ninety-three bids had been submitted for sixteen contracts with an average of 5.8 bids per contract. Six of the sixteen contracts were awarded to non-union contractors. Prior to the institution of the PLA, sixty-six bids were received on fifteen contracts for an average of 4.4 bids per contract. Three of the fifteen pre-PLA contracts were awarded to non-union contractors. In addition, the awarded costs of the post-PLA projects was twenty-three percent less than anticipated originally and the awarded costs of the pre-PLA projects was fourteen percent less than originally anticipated.

on these facts, we hold that the PLA at issue was adopted in conformity with Nevada's competitive bidding laws.

*Right to Work Statute*

Nevada's right to work statute, NRS 613.250, states:

> No person shall be denied the opportunity to obtain or retain employment because of nonmembership in a labor organization, or shall the state, or any subdivision thereof or any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of nonmembership in a labor organization.

This court has held that "an agreement by an employer to hire only union employees has been declared by the people of this state to be an unlawful objective." Bldg. Trades v. Bonito, 71 Nev. 84, 88, 280 P.2d 295, 297 (1955). *Bonito* involved an agreement in which an employer agreed to hire union employees unless the union could not supply employees within forty-eight hours, at which time other employees could be hired. *Id.* at 89, 280 P.2d at 297. This court held that the agreement violated Nevada's right to work act. *Id.*

Unlike *Bonito,* the PLA at issue allows both union and non-union contractors to bid on projects. Further, non-union contractors may use up to seven of their core employees selected on a one-to-one basis with employees referred by the union. Therefore, the PLA does not require that a project contractor hire only union employees. In addition, article IV, section 9 of the PLA provides that:

> No employee covered by this agreement shall be required to join any Union or pay any agency fees or dues as a condition of being employed, or remaining employed on the Project.

Given that the PLA does not mandate union membership as a condition of employment on the project and that non-union members may be hired to work on the project, we hold that the PLA does not violate Nevada's right to work statute.

*Freedom of Association Statute*

NRS 614.100, addressing employees' freedom of association, provides that employers must recognize the representatives chosen

by their employees in a labor dispute. Further, NRS 614.090(1) declares the public policy of the state as follows:

> [I]t is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

This court addressed NRS 614.090 in Vegas Franchises v. Culinary Workers, 83 Nev. 236, 427 P.2d 959, *affirmed on rehearing,* 83 Nev. 422, 433 P.2d 263 (1967). In *Vegas Franchises,* this court held that peaceful picketing by a labor union to force an employer to sign a collective bargaining agreement where the employees did not wish to join the union violated NRS 614.090. 83 Nev. at 240, 427 P.2d at 961.

In this case, article IV, section 1 of the PLA states:

> The Contractor recognizes the Union as the sole and exclusive bargaining representative of all craft employees within their respective jurisdictions working on the Project within the scope of this agreement.

However, as mentioned above, no employee is required to join the Union or to pay union dues. We conclude, following the reasoning of *Vegas Franchises,* that the public policy behind NRS 614.090 is to protect employees from being forced to join a union. Since the PLA at issue provides that an employee may work on the project for a non-union contractor without ever joining the union, we hold that the PLA does not interfere with employees' freedom of association.

In conclusion, we hold that PLAs do not violate Nevada's competitive bidding, right to work, or freedom of association statutes. However, PLAs must be adopted in conformity with our statutes and the policies behind them. We hold that the PLA at issue in this case was adopted in conformity with our statutes and, accordingly, affirm the judgment of the district court.