UNITED STATES OF AMERICA, Appellant, v. STATE ENGINEER, STATE OF NEVADA, Respondent.

No. 32740

July 24, 2001                                          27 P.3d 51

*United States Department of Justice, Environment and Natural Resources Division,* and *Andrew C. Mergen* and *Stephen G. Bartell,* Washington, D.C., for Appellant.

*Frankie Sue Del Papa,* Attorney General, and *Marta ·A. Adams,* Deputy Attorney General, Carson City, for Respondent.

---

*Allison MacKenzie Hartman Soumbeniotis & Russell* and *Karen A. Peterson,* Carson City, for Amici Curiae Eureka County and Humboldt River Basin Water Authority.

## OPINION

*Per Curiam:*

This appeal requires us to examine the scope and constitutionality of NRS 533.503, which regulates the issuance of state water appropriation permits that allow livestock to be watered on public lands. Respondent, State Engineer, State of Nevada (State

Engineer), denied nine applications filed by the United States Department of the Interior, Bureau of Land Management (BLM), for stockwater permits on public lands in Douglas County, Nevada. The State Engineer issued the denials after finding that the BLM was not a qualified applicant for stockwater permits, because it could not establish that it was "legally entitled to place the livestock on the public lands" pursuant to NRS 533.503. The BLM petitioned the district court for judicial review of the State Engineer's ruling. The district court denied the petition for judicial review and upheld the ruling of the State Engineer.

On appeal, the BLM contends that the plain language of NRS 533.503 authorizes the State Engineer to issue stockwater permits to the BLM. In the alternative, the BLM contends that if NRS 533.503 does not authorize the issuance of stockwater permits to the BLM, the statute is unconstitutional. We conclude that NRS 533.503 is unambiguous and that the plain language of the statute does not prohibit the BLM from receiving stockwater permits in the name of the United States. Thus, the statute does not violate the federal or state constitutions. We therefore reverse the order of the district court and remand the matter for the district court to enter an order granting the petition for judicial review.

## FACTS

On April 7, 1997, the State Engineer issued Ruling No. 4519, denying nine applications filed by the BLM for permits to appropriate public waters in Douglas County, Nevada. These applications were filed between 1991 and 1994. The BLM also has approximately ninety additional stockwater permit applications pending with the Office of the State Engineer. The nine applications sought to appropriate water from Red Canyon Springs, 5 O'clock Spring, Pinyon Spring, Buena Suerte Spring, and Winter's Mine Springs. The springs are located on BLM managed public lands within Douglas County, Nevada. The applications indicated that the water would be primarily appropriated for stockwatering purposes, with a minor amount of water to be used for the secondary purposes of wildlife and recreational use. The BLM filed the applications in the name of the appellant, United States.

In the applications, the BLM does not assert that it owns, or has a proprietary interest in any livestock that would be benefited by a stockwatering permit. The applications state that the BLM desires to appropriate the water for purposes of granting water rights to individuals seeking to obtain grazing permits from the BLM. If granted, the BLM, rather than the State of Nevada, would have the ultimate say in the distribution and use of the

stockwater rights amongst competing interests in the livestock industry.

The State Engineer found that the sources of water sought to be appropriated by the BLM would not interfere with existing water rights because they are isolated springs and not tributaries to other surface water sources on which there are existing water rights. The State Engineer concluded, however, that the BLM was not a qualified applicant for a stockwater permit. The State Engineer's determination was based upon an opinion issued by the Nevada Attorney General's office, dated February 11, 1997, which concluded that NRS 533.503 prohibits the State Engineer from issuing stockwater permits to the BLM, because the BLM is not a person who is authorized to graze livestock upon public lands. 97-05 Op. Att'y Gen. 27-64 (1997).

The BLM petitioned the district court for judicial review of the State Engineer's denial of its permit applications. Following a hearing, the district court denied the petition and affirmed the State Engineer's decision. The BLM timely appealed.[1]

## DISCUSSION

The BLM contends that the plain language of NRS 533.503 authorizes the State Engineer to issue stockwater permits to the United States in its own name and that the State Engineer should have granted the nine applications in question. NRS 533.503 provides that:

> 1. The state engineer shall not issue:
>
> (a) A permit to appropriate water for the purpose of watering livestock on public lands unless *the applicant for the permit is legally entitled to place the livestock on the public lands for which the permit is sought.*
>
> (b) A certificate of appropriation based upon a permit to appropriate water for the purpose of watering livestock on public lands unless the person who makes satisfactory proof that the water has been beneficially used is legally entitled to place on the land the livestock which have been watered pursuant to the permit.
>
> 2. This section must not be construed to impair the vested right of any person to the use of water for the purpose of watering livestock or to prevent any transfer of ownership of a water right for the purpose of watering livestock.

(Emphasis added.)

---

[1]Eureka County and Humboldt River Basin Water Authority (HRBWA) filed an amicus curiae brief in this case.

Specifically, the BLM contends that the phrase "legally entitled" is not ambiguous and means that either the landowner, or a person with the landowner's permission to use the land, is "legally entitled" to place livestock on the land. According to the BLM, the United States may be issued stockwater permits because, as the landowner, it is "legally entitled" to place livestock on the lands for which the permit is sought.

To the contrary, the State Engineer contends that "legally entitled to place the livestock on the public lands for which the permit is sought" means that the applicant must have a legal right to place livestock on public lands. Livestock cannot be placed upon public lands without a grazing permit or lease. Thus, the State Engineer reasons that since the United States, through the BLM, does not possess either a grazing permit or lease, it cannot qualify for a stockwater permit.

Statutory construction is a question of law which this court reviews de novo. *See Associated Bldrs. v. So. Nev. Water Auth.,* 115 Nev. 151, 156, 979 P.2d 224, 227 (1999). However, the appropriation of water in Nevada is governed by statute, and the State Engineer is authorized to regulate water appropriations. *See* NRS 533.030(1); NRS 533.370(3). Because the State Engineer is charged with administering NRS 533.503, that office has the implied power to construe the statute. " " "[G]reat deference should be given to the [State Engineer's] interpretation when it is within the language of the statute." " " *Pyramid Lake Paiute Tribe v. Washoe Co.,* 112 Nev. 743, 747-48, 918 P.2d 697, 700 (1996) (quoting *State v. State Engineer,* 104 Nev. 709, 713, 766 P.2d 263, 266 (1988) (citations omitted)). Therefore, while the interpretation of the State Engineer is not controlling, its decision shall be presumed correct, and the party challenging the decision has the burden of proving error. *See* NRS 533.450(9).

The United States asserts that the State Engineer erred because he went beyond the plain meaning of the statute in construing the statute. We agree. While it is true that an administrative agency's interpretation of its own regulation or statute is entitled to consideration and respect—especially where, as here, the State Engineer has a special familiarity and expertise with water rights issues—it is well established that "[w]hen the language of a statute is plain and unambiguous, a court should give that language its ordinary meaning and not go beyond it." *City Council of Reno v. Reno Newspapers,* 105 Nev. 886, 891, 784 P.2d 974, 977 (1989). "[A]n [administrative] agency's interpretation of a regulation or statute does not control if an alternative reading is com-

pelled by the plain language of the provision.'' *Southern Cal. Edison,* 102 Cal. Rptr. 2d at 698 (citations omitted); *see also Neer v. Oklahoma Tax Comm'n,* 982 P.2d 1071, 1078 (Okla. 1999) (administrative construction cannot override plain statutory language).

NRS 533.503 is not ambiguous. To be considered ambiguous, a statute must be capable of two or more reasonable but inconsistent interpretations. *Gallagher v. City of Las Vegas,* 114 Nev. 595, 599, 959 P.2d 519, 521 (1998). The BLM contends that the phrase ''legally entitled to place the livestock on the public lands'' means that an applicant for a stockwatering permit has a legal right to use the public land for grazing. The State Engineer contends that the statute is capable of being interpreted in a different fashion. The State Engineer argues that this phrase means that an applicant must have a BLM grazing permit or lease. The State Engineer then asserts that since the BLM does not issue permits to itself, it cannot be a qualified applicant and is not entitled to the livestock watering permits. To say that the United States, the owner of the public land, must issue itself a permit or lease to graze livestock upon the land that it owns is an illogical and unreasonable construction of the statutory language. Therefore, NRS 533.503 is not capable of two or more reasonable interpretations. A plain reading of the statute indicates it requires an applicant to have some legal authority to use the public land for grazing purposes and nothing else. The State Engineer exceeded the scope of his authority by ignoring the plain meaning of the statute and erroneously resorting to legislative history to interpret the statute.

## CONCLUSION

We conclude that the phrase ''legally entitled to place the livestock on the public lands for which the permit is sought'' in NRS 533.503 is unambiguous. It simply requires an applicant for a stockwater permit to have a legal right to graze livestock on the public land. As the owner of the BLM land, the United States is entitled, and Congress has authorized, the grazing of livestock on the public lands managed by BLM. Thus, the BLM is a qualified applicant under NRS 533.503. Accordingly, we reverse the order of the district court denying the petition for judicial review and remand the matter to the district court with directions to grant the petition.

BECKER, J., concurring in part and dissenting in part:

I disagree with the majority's conclusion that NRS 533.503 is unambiguous. I believe the phrase ''legally entitled to place the

livestock on the public lands for which the permit is sought'' is capable of two reasonable constructions. Therefore, the statute is ambiguous and the State Engineer acted properly when he sought the Attorney General's opinion as to the meaning of the statute.

If only the words ''legally entitled'' are considered in interpreting the statute, then the United States would be correct in asserting the plain-meaning doctrine. However, the statute does not state, as argued by the BLM, that an applicant must be legally entitled to place livestock on public lands. The statute states that an applicant must be ''legally entitled to place *the* livestock on the public lands for which the permit is sought.'' NRS 533.503 (emphasis added).

In this context, ''legally entitled'' might reasonably apply as a qualifier to the words ''the livestock'' rather than to the words ''on the public lands.'' This suggests that an applicant must have a legal right or proprietary interest in the livestock to be watered by the permit as opposed to the legal right to place the livestock on the public lands. In other words, an applicant must have control over the livestock, not the land.

The United States does not have a legal interest in the livestock to be watered under the applications. The applications seek permission to water certain numbers of livestock or wildlife in a generic fashion. The BLM is not authorized by Congress to raise livestock in the name of the United States. Therefore, the BLM, as an agent of the United States, would not be able to qualify for a stockwater permit in the sole name of the United States. Based upon a review of the Legislative history surrounding the enactment of NRS 533.503, I conclude that this is precisely what the Legislature intended. However, if the statute is interpreted in the fashion intended by the Legislature it violates the Supremacy Clause of the United States Constitution. Therefore I concur in the majority's decision because it construes the statute in such a way as to avoid any constitutional infirmities.

I. *Historical perspective*

Nevada's water law, like that of other western states, is exclusively based on the prior appropriation doctrine, which recognizes water rights based on the time of use, as well as actual use, of water without regard to the ownership of land contiguous to a water course. The common law doctrine of riparian rights, where control over water is tied to ownership of land, has been completely abrogated in Nevada. At common law, a landowner had control over the waterways passing over or under his or her land under the riparian rights doctrine. Decisions regarding the use and management of the water were left to the discretion of the individual landowner.

The prior appropriation doctrine was developed to address problems created by the riparian rights approach in circumstances where water is a scarce commodity. In arid conditions, allowing water to be controlled by individual landowners was deemed to be harmful to the public at large. The government, not the individual, should be entitled to make decisions affecting water resources. As the driest state in the nation, Nevada's supply of water, even with the most effective management tools, is often insufficient to supply the state's needs. Therefore, as a matter of public policy, Nevada has determined that the prior appropriation doctrine is the best method of allocating this most precious of natural resources. As such, surface water is declared to be the property of the citizens of the State of Nevada. *See* NRS 533.025. Codified as Chapter 533 of Nevada Revised Statutes, allocation of surface water under the prior appropriation doctrine is determined, measured and limited by beneficial use. Nonuse leads to loss of appropriated water rights. *See* NRS 533.030; NRS 533.035; NRS 533.045.

There are two classes of surface water rights by appropriation in Nevada: (1) vested rights, which were initiated during the early days of the state's development before any definite laws concerning appropriation of water existed; and (2) appropriation rights under which water is appropriated and beneficially used by virtue of permits granted by the State Engineer upon due application made to his office. *See* NRS 533.085; NRS 533.325. This case involves the latter class of permitted water rights.

Because the federal government owns a large amount of the land situated within Nevada, citizens have frequently expressed concern that decisions regarding the management of those lands will be made by national agencies without considering the detrimental impact such decisions may have within the state. For example, prior to the enactment of the Taylor Grazing Act, ch. 865, 48 Stat. 1269-1275 (1934) (codified as amended at 43 U.S.C. §§ 315-316 (1994)), the State of Nevada regulated the issuance of grazing permits on public land. *See* 1925 Nevada Stockwatering Act, 1925 Nev. Stat., ch. 201, §§ 1-7, at 348-50; NRS 533.485-533.510. *See also Ansolabehere v. Laborde,* 73 Nev. 93, 310 P.2d 842 (1957) (discussing the conflicts between the state and the federal government over the management of public lands).

As Nevada's population has grown, apprehension over control of water rights has resulted in the development of new policies or procedures for managing water resources. Prior to 1980, the BLM had a policy of asserting control over the development of water rights on lands managed by the BLM. The BLM failed to comply with state law regarding the development of water rights and, as

a result, conflicts arose between the state and the BLM over water rights.[1]

The actions of the BLM were looked upon with disfavor because they permitted the United States to obtain the water rights and then reallocate them amongst competing interests without input from the State Engineer. The United States would also determine how much of the permitted water to allocate at any given time.

In response, the State Engineer implemented an informal policy (known as the "three-way system") to deal with the allocation of water rights on federal land. The three-way system allowed water rights for watering livestock on public lands to be acquired and perfected by the range user, the federal government, or jointly by the range user and the federal government depending upon who developed the water right.

A permit allows the applicant to develop the water rights, *i.e.*, drill a well, etc. Before a certificate of appropriation is issued, the permit recipient must demonstrate that any improvements have been completed and the water has been put to the beneficial use indicated in the application for the permit. This latter process is the perfection of the right. Whether the permit was issued jointly or individually depended upon who was developing the water rights and the specifics of the beneficial use. The State Engineer encouraged the United States to utilize joint applications whenever possible and the BLM frequently accommodated the state in this regard.[2]

Periodic actions were taken to prohibit the federal government from obtaining water rights in its own name. For example, in *State v. State Engineer,* 104 Nev. 709, 715, 766 P.2d 263, 267 (1988), arguments were made that the federal government could not demonstrate it was putting water to a beneficial use because it did not own the livestock to be watered. This court, however, held that the United States was a person under the statutory scheme then in existence and was entitled to be treated as any other person applying for a water permit. *Id.* at 717. Since the statute did not require applicants to own the livestock to be watered, such a requirement could not be imposed upon the United States.

Thus, for a number of years, the BLM was issued stockwatering permits in either its own name or jointly with the entity grazing the livestock. In the early 1990s, the federal government, in a desire to improve the management of federal lands, embarked on a course of action that became known as "Rangeland Reform."

---

[1]Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., March 15, 1995).

[2]Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., February 27, 1995).

Rangeland Reform stressed the need for the federal agencies charged with administering federal lands, to manage those lands so as to gain the most advantage from the land, while still preserving the land and its resources for future generations. As a major resource, water was the subject of many of the discussions regarding the content of reform proposals. Concerned with the possible effect such federal proposals could have on the State of Nevada, the 1993 Nevada Legislature authorized the creation of an interim study committee, the Committee on Use, Allocation and Management of Water, to monitor Rangeland Reform proposals. The Legislature feared that the federal government might depart from its long-standing policy of deference to the states in the area of water law.[3] Eventually, the BLM published a proposed regulation, later codified at 43 C.F.R. § 4120.3-9 (1995), which contained the following water rights provision:

> Any right acquired on or after August 21, 1995, to use water on public land for the purpose of livestock watering on public land shall be acquired, perfected, maintained and administered under the substantive and procedural laws of the State within which such land is located. To the extent allowed by the law of the State within which the land is located, any such water right shall be acquired, perfected, maintained, and administered in the name of the United States.

*Id.*

The interim study committee expressed concern with the language in the proposed regulation that directed the federal government to exercise substantial control over water used for livestock watering on public land. To the committee, this appeared to be an attempt by the federal government to interfere in the management of Nevada's water. As a result, the interim committee issued a report recommending that the Legislature enact laws formalizing existing policies of the State Engineer with respect to the issuance of stockwater permits to the BLM.

The proposed federal regulations also created concern within the state's Department of Conservation and Natural Resources. The Department was apprehensive about the language in the proposed regulation which stated that "[t]o the extent allowed by the law of the State" water was to be "acquired, perfected, maintained, and administered in the name of the United States." *Id.* Because the existing three-way system was only an informal policy of the State Engineer, the Department believed the three-way system needed to be codified to prevent the United States from using the language of the regulation as grounds for asserting complete control over the stockwatering rights on public lands.

---

[3]S.B. 327, 67th Leg. (Nev. 1993).

The Department reasoned that the BLM might argue that Nevada had no state law, only informal policies, and that the BLM was free to act unilaterally to control waters on its lands. The interim study committee shared these concerns. For this reason, the Department requested that a bill be drafted to codify existing policies of the State Engineer and the interim committee recommended support of the bill draft request. This request became Senate Bill 96 and was introduced at the 1995 legislative session.[4]

Senate Bill 96 was assigned to the Senate Natural Resources Committee. The Committee received advice from the Legislative Counsel Bureau's office that Nevada's ability to continue to utilize the three-way system in light of the new federal regulations depended on its adopting the system statutorily. While the bill was originally intended to simply codify the existing policies, at the subsequent hearings on the bill the entire issue of the propriety of issuing stockwatering permits to the United States was debated.

As a result of hearings before the Natural Resources Committee and the Assembly Committee on Government Affairs, significant changes to the initial language of proposed S.B. 96 were made. The final version of S.B. 96 did not codify the then-existing three-way system. Instead, it created a new policy for the issuance of stockwatering permits on public lands. This policy, now codified as NRS 533.503, provides:

> 1. The state engineer shall not issue:
> (a) A permit to appropriate water for the purpose of watering livestock on public lands unless *the applicant for the permit is legally entitled to place the livestock on the public lands for which the permit is sought.*
> (b) A certificate of appropriation based upon a permit to appropriate water for the purpose of watering livestock on public lands unless the person who makes satisfactory proof that the water has been beneficially used is legally entitled to place on the land the livestock which have been watered pursuant to the permit.
> 2. This section must not be construed to impair the vested right of any person to the use of water for the purpose of watering livestock or to prevent any transfer of ownership of a water right for the purpose of watering livestock.

(Emphasis added.)

II. *Statutory construction of NRS 533.503*

When a statute is ambiguous, it should be construed consistent " 'with what reason and public policy would indicate the legislature intended.' " *Robert E. v. Justice Court,* 99 Nev. 443, 445, 664 P.2d 957, 959 (1983) (quoting *Cannon v. Taylor,* 87 Nev.

---

[4]S.B. 96, 68th Leg. (Nev. 1995).

285, 288, 486 P.2d 493, 495 (1971), *adhered to, withdrawn in part*, 88 Nev. 89, 493 P.2d 1313 (1972)). Thus, we look to the legislative history behind NRS 533.503 to determine the meaning that the Legislature intended for the phrase "legally entitled to place the livestock on the public lands for which the permit is sought" within the statute.

Several factors can be used to determine legislative intent. The title of a statute can be considered. *See A Minor v. Clark Co. Juvenile Ct. Servs.*, 87 Nev. 544, 548, 490 P.2d 1248, 1250 (1971). Other words or phrases used in the statute or separate subsections of the statute can be reviewed to determine the meaning and purpose of the statute. *See Bd. of County Comm'rs v. CMC of Nevada*, 99 Nev. 739, 744, 670 P.2d 102, 105 (1983). Legislators' statements can be considered in construing the statute when they are a reiteration of events leading to the adoption of the statute rather than an expression of personal opinion. *Khoury v. Maryland Casualty Co.*, 108 Nev. 1037, 1040, 843 P.2d 822, 824 (1992), *disapproved of on other grounds by Breithaupt v. USAA Property and Casualty*, 110 Nev. 31, 867 P.2d 402 (1994). Finally, the subject matter of the statute and the policy to be effectuated can be used in statutory construction. *See Welfare Div. v. Washoe Co. Welfare Dep't*, 88 Nev. 635, 503 P.2d 457 (1972).

During the course of several hearings, a number of proposed amendments to S.B. 96 were debated and discussed by members of the Legislature. While such comments alone would not be indicative of legislative intent, the failure to adopt many of the proposed changes and the adoption of the final language of the bill is relevant in determining legislative intent.

The comments, together with the consideration of the various proposed amendments, demonstrate that the lawmakers intended to eliminate the three-way system of issuing stockwater permits. Instead, the Legislature desired to create a new system that would prohibit the BLM from obtaining a stockwatering permit in its own name, unless it had some legal or proprietary interest in the livestock to be watered under the permit. The Legislature wanted to preserve state primacy over water rights without unconstitutionally discriminating against the federal government.

First, the Legislature was concerned that Rangeland Reform was an attempt by the federal government to undermine its longstanding policy of deference to the states in the area of water law. Thus, the Department of Conservation and Natural Resources lobbied for a legislative preference for the three-way system of stockwater allocation, rather than have all stockwater permits issued in the sole name of the BLM. Therefore, the original version of S.B. 96, provided in part, that:

Section 1. Chapter 533 of NRS is hereby amended by adding thereto a new section to read as follows:

*1. When issuing a certificate of appropriation pursuant to NRS 533.425 for the right to use water for the purpose of watering livestock on public land, the state engineer shall issue the certificate of appropriation:*

*(a) If the application was perfected by a person other than the Federal Government, in the name of that person;*

*(b) If the application was perfected by the Federal Government, in the name of the Federal Government; or*

*(c) If the application was perfected jointly by a person other than the Federal Government and by the Federal Government, in the name of that person and the Federal Government jointly.*

*2. As used in this section, "Federal Government" includes any agency, department, instrumentality or corporation of the Federal Government.*

S.B. 96, 68th Leg. (Nev. 1995).

When Senator Mark James introduced S.B. 96 to the Natural Resources Committee on February 27, 1995, he indicated that the measure was intended to codify the informal three-way system for issuing stockwater permits that the State Engineer had utilized since the 1980s. This system would allow a rancher to apply for a water right independently, a federal land management agency to apply independently, or the rancher and federal land management agency to apply in conjunction with each other. Senator James noted that his understanding of S.B. 96 was that "if the federal government owned cows which were being watered on their land, then they could get water rights solely in the name of the federal government . . . [but] it seems the government could never get water rights in their name unless they have livestock."[5]

However, HRBWA lobbyist Mike Baughman expressed concern at the hearing that codifying the three-way system would not be in Nevada's best interest, because it would inadvertently facilitate the federal government's reform policy of acquiring all water rights solely in the name of the United States. Baughman noted that while the BLM had been cooperating with the State Engineer in filing joint applications, the new federal regulation would compel the BLM to file all applications in the sole name of the United States, if that were permitted under state law.

In response, Senator James indicated that the interim study committee considered a bill that outright prohibited the BLM from acquiring stockwater permits in its name. However, the interim committee felt that the language of the bill draft submitted by the Department of Conservation and Natural Resources clearly expressed the legislative intent which was that "if every-

[5]Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., February 27, 1995).

thing having to do with perfection [of stockwater rights] was accomplished by the individual, the federal government will not have any name on there. The federal government will be required to adhere to the exact program that has been outlined under existing policy."[6]

Subsequently, at the March 15, 1995, hearing, Baughman presented the committee with a report detailing the applications, permits and certificates involving stockwater and the BLM. The report indicated the number of permits issued solely in the name of the BLM, as well as the number of joint permits issued. Baughman argued that the United States would no longer seek joint permits due to Rangeland Reform, which would be a substantial change in current practice. Thus, Baughman encouraged the committee members to amend S.B. 96 to eliminate the three-way system. Instead, Baughman proposed that the legislature codify a two-way system. The BLM would only be able to obtain a joint permit with persons having an interest in the livestock.[7] Baughman proposed the following amendment to S.B. 96:

> Section 1. Chapter 533 of NRS is hereby amended by adding thereto a new section to read as follows:
> *1. Whenever, pursuant to the provision of this chapter, the federal government seeks to appropriate water to support livestock watering on public lands, the state engineer shall require that applications for such water be filed jointly by the federal government and the permittee having authorization to graze livestock on said lands.*
> 2.[1.] When issuing a certificate of appropriation pursuant to NRS 533.425 for the right to use water for the purpose of watering livestock on public land, the state engineer shall issue the certificate of appropriation:
> (a) If the application was perfected by a person other than the Federal Government, in the name of that person;
> *(b) If the application was perfected jointly by a person other than the Federal Government and by the Federal Government, in the name of that person and the Federal Government, jointly.* [If the application was perfected by the Federal Government, in the name of the Federal Government; or]
> [(c) If the application was perfected jointly by a person other than the Federal Government and by the Federal Government, in the name of that person and the Federal Government jointly.]

---

[6]Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., February 27, 1995).

[7]A two-way system allows a rancher to apply for a water right independently or in conjunction with a federal land management agency.

*3.*[2.] As used in this section, "Federal Government" includes any agency, department, instrumentally [sic] or corporation of the Federal Government.

Hearing on S.B. 96 Before Senate Natural Resources Comm., 68th Leg. (Nev., February 27, 1995); Hearing on S.B. 96 Before Senate Natural Resources Comm., 68th Leg. (Nev., March 15, 1995).

Committee members discussed the proposed amendment, and Senator Dean Rhoads, Chairman of the Natural Resources Committee, asked Mike Turnipseed, the State Engineer, why the BLM would receive stockwater certificates if it does not own the livestock for which the permit is sought. Turnipseed answered that the determination to grant certificates of appropriation to the BLM resulted from this court's decision in *State v. State Engineer,* 104 Nev. 709, 766 P.2d 263 (1988), which led the State Engineer to treat the federal government "as fairly as any other appropriator."[8]

Following Turnipseed's remarks, Senator James commented that, when considering the bill draft, the interim study committee was under the erroneous impression that the BLM had not been filing applications for stockwater permits solely in its name. The Senate Committee then discussed enacting a two-way system, and Senator James indicated that S.B. 96 would have to be amended, stating that he "did not know that the federal government could file for [the watering of] livestock when it did not own any livestock."[9]

No action was taken on the bill. At an additional hearing on June 9, 1995, Baughman presented the Committee with another proposed version of S.B. 96 which stated:

Section 1. Chapter 533 of NRS is hereby amended by adding thereto a new section to read as follows:

*1. Whenever, pursuant to the provisions of this chapter, a governmental entity responsible for administration of public lands seeks to appropriate water to support livestock watering on public lands, the state engineer shall require that applications for such water be filed jointly by the governmental entity responsible for administration of public lands*

---

[8]At the time that *State v. State Engineer* was decided, the existing statutes did not require any permit holder to have an ownership interest in the livestock to be watered. The district court attempted to impose such a requirement upon the United States. This court held that the statute did not make such a distinction and it was, therefore, improper for the district court to overturn the decision of the State Engineer to issue the permit in the name of the United States.

[9]Hearing on S.B. 96 Before Senate Natural Resources Comm., 68th Leg. (Nev., February 27, 1995).

*and the permittee having authorization to graze livestock on said lands.*

2.[1.] When issuing a certificate of appropriation pursuant to NRS 533.425 for the right to use water for the purpose of watering livestock on public land, the state engineer shall issue the certificate of appropriation:

(a) If the application was perfected by a person other than a *governmental entity responsible for administration of public lands* [the Federal Government], in the name of that person;

(b) *If the application was perfected jointly by a person other than a governmental entity responsible for administration of public lands and by the governmental entity responsible for administration of public lands, in the name of that person and the governmental entity responsible for administration of public lands, jointly.* [If the application was perfected by the Federal Government, in the name of the Federal Government; or]

[(c) If the application was perfected jointly by a person other than the Federal Government and by the Federal Government, in the name of that person and the Federal Government, jointly.]

3.[2.] As used in this section, *"governmental entity responsible for administration of public lands"* ["Federal Government"] includes any agency, department, instrumentally [sic] or corporation of *a local government, the State of Nevada or* the Federal Government.

Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., June 9, 1995).

Peter Morros, Director of the State Department of Conservation and Natural Resources, expressed concern regarding the constitutionality of this version. Morros questioned whether the proposed language was consistent with the *State v. State Engineer* decision. Morros also expressed similar concerns at previous hearings.[10] Morros commented that the current three-way system for issuing stockwater rights permits worked well, and that he felt prolonged litigation would result and obstruct this system if the federal government was precluded from acquiring stockwater permits in its own name. The Committee agreed to hold the bill for further work prior to voting on it.

The next hearing was held on June 12, 1995. Morros again expressed concern over the constitutionality of a bill that would preclude the federal government from acquiring stockwater per-

---

[10]Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., March 15, 1995); Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., June 9, 1995).

mits and certificates in its own name. Morros suggested another amendment to S.B. 96 that read:

> No party holding a stock water right on lands managed by a public agency may deny access to that water to wildlife or to any livestock authorized to graze in the area.

Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., June 12, 1995).

Committee members expressed dissatisfaction with Morros' proposed amendment because it "would still give a lot of room for the federal government entities to secure water under their name." *Id.*

At that same hearing, Gordon DePaoli, a lobbyist with Sierra Pacific Power Company, offered still another amendment to S.B. 96 as follows:

> Amend the bill as a whole by deleting page 1, lines 1 through 25, and page 2, lines 1 through 3, and substituting:
>
> *1. Whenever, pursuant to the provisions of this chapter, an application is made for a permit to appropriate water for watering livestock on public lands, the state engineer may not issue a permit therefor or a certificate based upon a permit so issued, unless the person applying for the permit or proving beneficial use is the owner of the livestock to be watered or which have been watered pursuant to the permit.*
>
> *2. Nothing in this section is intended to impair the vested right of any person to the use of water for watering livestock nor shall it prevent the transfer of ownership of a water right for watering livestock.*

Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., June 12, 1995).

While DePaoli's version alleviated Morros' concerns regarding discrimination against the federal government, the new language posed its own problems. Specifically, it would preclude a private landowner who leased pasture for grazing from acquiring rights for watering livestock. In addition, Turnipseed commented that, under DePaoli's version, ranchers who finance their livestock through banks would be precluded from obtaining stockwater permits if the bank actually owns their livestock or has a security interest in the livestock. Finally, grazing associations do not own the livestock, so they would be precluded from obtaining stockwater permits if the issuance of permits was based on livestock ownership. *Id.*

No resolution was reached and the bill was passed until June 14, 1995. At that hearing, Turnipseed suggested another amendment to S.B. 96 that stated:

When an application is filed with the state engineer for livestock water on federal lands:

1. The state engineer shall notify the land management agency as well as all livestock lessees or permitees of record.

2. Any notified party will have the opportunity to file a concurrent application on the same source.

3. If the concurrent applications meet the criteria set forth in *[Nevada Revised Statutes]* NRS 533.370, all must be approved with the same priority.

4. If at a later date, a change application is filed by any of the holders of such concurrent rights, the state engineer shall give notice to all other holders of concurrent rights on the same source.

Hearing on S.B. 96 Before the Senate Natural Resources Comm., 68th Leg. (Nev., June 14, 1995).

Turnipseed explained that the amendment was essentially a notice provision that would make private ranchers and the federal government aware of any permit or certificate changes on a water source. Although the Natural Resources Committee noted that Turnipseed's proposed amendment had merit, it eventually moved to amend and pass S.B. 96 with changes proposed by the Legislative Counsel Bureau which replaced the language "owner of the" suggested in DePaoli's proposed amendment with the phrase "person legally entitled to place [livestock] on the [public] land." *Id.* The bill was then passed, as amended, by the full Senate and introduced to the Assembly. It was then referred to the Assembly Government Affairs Committee.

The Government Affairs Committee made some additional amendments to the bill on issues unrelated to the concepts of legal entitlement, and voted to pass S.B. 96 on June 27, 1995. In its final version, S.B. 96, as amended by Amendment No. 1070 provided, in pertinent part, that:

Amend section 1, page 1, by deleting lines 3 through 14 and inserting:

*1. The state engineer shall not issue:*

*(a) A permit to appropriate water for the purpose of watering livestock on public lands unless the applicant for the permit is legally entitled to place the livestock on the public lands for which the permit is sought.*

*(b) A certificate of appropriation based upon a permit to appropriate water for the purpose of watering livestock on public lands unless the person who makes satisfactory proof that the water has been beneficially used is legally entitled to place on the land the livestock which have been watered pursuant to the permit.*

> 2. *This section must not be construed to impair the vested right of any person to the use of water for the purpose of watering livestock or to prevent any transfer of ownership of a water right for the purpose of watering livestock.*

S.B. 96, 68th Leg. (Nev. 1995).

In light of the legislative history, I conclude that the legislature intended the phrase "legally entitled to place the livestock on the public lands for which the permit is sought" in NRS 533.503 to mean that the applicant for a stockwater permit must have a legal or proprietary interest in the livestock to be watered. Thus, since the BLM is not authorized to raise livestock and has no interest in the livestock to be watered, it is not a qualified applicant under NRS 533.503 for a stockwater permit solely in its name.

### III. *Constitutionality of NRS 533.503*

Having concluded that NRS 533.503 does require an applicant to have a legal or proprietary interest in the livestock to be watered under a stockwater permit, I turn to the United States' contention that NRS 533.503, as interpreted, is unconstitutional. The United States contends that NRS 533.503 discriminates against the federal government, or frustrates federal policy, in violation of the Supremacy Clause of the United States Constitution.[11]

The constitutionality of a state statute is analyzed de novo by this court, beginning with the presumption that a legislative enactment is constitutional. *See List v. Whisler,* 99 Nev. 133, 137-38, 660 P.2d 104, 106 (1983). If reasonably possible, this court should construe the statute so as to render it constitutional, and the party challenging the statute bears the burden of establishing that it is unconstitutional. *See id.*

The claims of the United States focus on two issues. The first is that the State Engineer has interpreted the term "public lands" as used in the statute to mean only those lands managed by the BLM. The statute does not govern other lands owned by the United States, but managed by a different agency such as the Forestry Service, or lands owned by the State of Nevada. Thus, the limitations requiring an applicant to have a legal interest in the livestock to be watered apply only to land managed by the BLM.

The second issue involves the concept of the term "legally entitled," and the decision by the Attorney General and the State Engineer that the United States may not obtain a stockwater per-

---

[11]U.S. Const. art. VI, cl. 2.

The United States has also argued that the statute violates the Due Process and Equal Protection Clauses of the Nevada Constitution. I have considered these claims and find them to be without merit.

mit, either in its own name or as a joint applicant.[12] The United States contends that if it is not permitted to obtain stockwater permits either in its own name or jointly with persons having a legal interest in livestock grazing on BLM lands, then the ability of the BLM to properly manage the range land will be substantially frustrated or impeded.

The United States Supreme Court held long ago that a state law violates the Supremacy Clause of the United States Constitution if it regulates the federal government directly or discriminates against it, or those with whom it deals. *See McCulloch v. Maryland,* 17 U.S. 316 (1819). However, a state law that indirectly regulates or affects the federal government's activity is not unconstitutional per se. In such cases, the Supreme Court has adopted a functional approach to claims of governmental immunity, accommodating each sovereign's legislative authority and respecting the primacy role of Congress in resolving conflicts between the national and state governments. *See North Dakota v. United States,* 495 U.S. 423, 434-35 (1990). This body of law is generally referred to as the intergovernmental immunities doctrine.

When analyzing whether a state law discriminates against the federal government, the state law should not be viewed in isolation and the entire regulatory system should be analyzed to determine whether it is discriminatory. *North Dakota,* 495 U.S. at 435. Moreover, it is not appropriate to look only at those provisions of the state law addressing the federal government or those with which it deals. *See id.* at 438. A state law that appears to treat the federal government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory if the state law does not treat the federal government any worse than it treats any other entity affected by the law. That is, the federal government is not placed at a disadvantage in comparison to any other entity. *See id.*

Finally, a state law may violate the Supremacy Clause if it "actually and substantially interferes with specific federal programs." *North Dakota,* 495 U.S. at 452 (citations omitted). .

### A. *Public lands and the Supremacy Clause—United States as a landowner*

The United States first contends that the provisions of NRS 533.503 directly regulate the federal government because it applies only to lands managed by the BLM. I disagree. As noted

[12]None of the nine applications in this case are joint applications. However, in its decision denying the applications, the State Engineer determined that the BLM was also prohibited from filing a joint application. The United States has raised this issue in the context of the constitutionality of the statute, as interpreted, and the matter is therefore properly before the court.

by the State Engineer, the statute, on its face, does not regulate the United States or the BLM. Instead, it regulates the issuance of permits and certificates relating to the appropriation of Nevada's water for the purpose of watering livestock on public lands. It does not directly prohibit the BLM, as an agency of the United States, from applying for a permit to water livestock or from receiving a certificate of appropriation for that purpose. As it does not directly regulate the United States, there is no prima facie violation of the Supremacy Clause.

The United States also contends that the statute, as interpreted, is discriminatory because it places the BLM in a worse position than any other landowner seeking to develop stockwater rights upon their property. In response, the State Engineer argues that the United States is only considering a very narrow portion of the statutory scheme involving the appropriation of water in Nevada, and that *North Dakota* requires the court to review NRS 533.503 in the context of Nevada's entire policy regarding water appropriation.

Turning first to the statute itself, I conclude that it is not discriminatory on its face. Although NRS 533.503 has the effect of precluding the BLM from obtaining stockwater permits for livestock, the BLM is not being denied water rights per se. The BLM can obtain a stockwater permit if it has a legal or proprietary interest in the actual livestock to be watered. The BLM does not qualify for a permit or certificate only because it is not currently authorized to raise livestock. Moreover, the federal government is no worse off than a private individual or the state. Any person who does not have a legal or proprietary interest in the livestock to be watered will be prohibited from obtaining a stockwater permit.

When considered in the context of livestock water only, the statute clearly treats the United States (BLM) as a landowner differently than all other landowners in the state. However, the United States has not demonstrated that this distinction, in and of itself, places the United States (BLM) at a disadvantage versus any other landowner who wishes to use his land to water his livestock. This difference, alone, is not enough to constitute a discriminatory practice in violation of the Supremacy Clause.

Moreover, the distinction becomes even more insignificant when considered in light of Nevada's entire water appropriation scheme. Only the BLM's right to use the water for livestock purposes is affected; the BLM is not treated differently than any other landowner with respect to other permitted uses.

I conclude that NRS 533.503 is not discriminatory simply because the definition of public lands, as interpreted by the State Engineer, applies only to United States' land managed by the BLM.

B. *United States as a qualified applicant and the Supremacy Clause*

Even if NRS 533.503 does not discriminate against the United States (BLM) as a landowner, the United States asserts that the statutory scheme becomes discriminatory because it actually and substantially interferes with a federal policy or program. The BLM argues that the inability to obtain stockwater rights in its own name or jointly with a range user significantly impairs its power to properly manage federal rangeland in accordance with congressional mandates.

Alternatively, the BLM contends that this burden violates the pre-emption doctrine as discussed by Justice Brennan in his concurrence and dissent in *North Dakota*.

The State Engineer argues that Congress has not expressly pre-empted state law concerning water rights on federal land and has, in fact, deferred to the states in this regard. In addition, the State asserts that the Rangeland Reform regulations only establish a policy of United States ownership of water rights if permitted by state law. Thus, Nevada's statutory scheme cannot be discriminatory in violation of the intergovernmental immunities doctrine, or a significant impairment of a federal policy or program in violation of the pre-emption doctrine.

I agree with the State that the federal government has not expressly pre-empted state law on this issue. Moreover, when considering the livestock watering regulations under Rangeland Reform, the federal government contemplated that the definitions of qualified applicants and beneficial use would be addressed through state law. *See* Water Rights for Purpose of Livestock Grazing on Public Lands, 43 C.F.R. § 4120.3-9 (1995).

However, nothing in the commentary to the federal regulations indicates that the United States contemplated a situation in which the BLM would be prohibited from applying for livestock watering rights not only under its own name, but also jointly with livestock grazers. Thus, the United States is still free to argue that the restrictions of NRS 533.503 create an actual and substantial interference with federal policy in violation of the Supremacy Clause.

While the statute on its face does not bar the BLM from being a qualified applicant in its own name, it has that effect because the BLM is not a person "legally entitled to place the livestock on the public lands." This provision, together with the fact that the statute, as interpreted by the State Engineer, only applies to lands managed by the BLM, arguably poses a greater impact upon the issue of discrimination than that created solely by the restrictive interpretation of the phrase "public lands."

Even considering the two aspects together, I still conclude that the United States has not shown how it is so disadvantaged by the inability to obtain a permit in its own name, that it is being dis-

criminated against within the meaning of the Supremacy Clause. Although the BLM may find it more convenient to possess livestock watering rights solely in its own name, the commentary[13] to the federal regulations reflects that the BLM contemplated situations where such would not be permitted by state law. Moreover, NRS 533.503 only affects stockwatering rights, not any other aspect of the Rangeland Reform program. The fact that it would be easier to accomplish management of the BLM lands, particularly for grazing purposes, if the BLM held the livestock watering rights solely in its name, is insufficient to establish discrimination under criteria discussed in *North Dakota* and other federal cases. However, I recognize that this is a close issue. A statute which did not ban the BLM from applying for stockwatering permits in its own name, but set limits or guidelines for the issuance of such permits would be preferable from a constitutional perspective.

I reach a different conclusion on the constitutionality of the statute, however, when considering the issue of joint applications. If NRS 533.503 is construed to prohibit the BLM from applying for livestock watering rights jointly with the entity who is ''entitled to place the livestock on the public lands,'' then such a restriction, together with the restrictive interpretation of public lands, violates the Supremacy Clause of the United States Constitution.

The BLM is required by Congress to develop the resources upon the public lands under its control. These resources are to be developed so as to maximize the use of the land while conserving it for future generations. Public Rangeland Improvement Act, 43 U.S.C. § 1901 (1994). Water is one of the resources discussed in the Act. In Nevada, under the prior appropriations doctrine, the BLM may only develop water resources on its land with the approval of the state. If the BLM is effectively prohibited from filing a joint application for stockwater, then the decisions on how, when and where to develop water for livestock purposes would be shifted entirely into the hands of third parties. This would be a significant interference with the BLM's control and management of its rangelands. Such interference would constitute discriminatory regulation in violation of the Supremacy Clause.

Under *List v. Whisler,* 99 Nev. 133, 660 P.2d 104 (1983), we strive to construe statutes so as to avoid rendering them unconstitutional. Thus I would construe the statute to permit joint applications. Moreover, I am not persuaded that NRS 533.503 was intended to prohibit joint applications. The statute itself does not address the issue of joint permits or certificates of appropriation.

---

[13]43 C.F.R. § 4120.3-9 (1995).

This concept was a part of the informal three-way system and is codified at NRS 533.425(1). NRS 533.425(1) provides that:

> Except as otherwise provided in NRS 533.503, as soon as practicable after satisfactory proof has been made to the state engineer that any application to appropriate water or any application for permission to change the place of diversion, manner or place of use of water already appropriated has been perfected in accordance with the provisions of this chapter, the state engineer shall issue to the holder or holders of the permit a certificate . . . .

The idea of multiple permit holders was a part of the 1995 amendments to the Adjudication of Water Rights chapter of the Nevada Revised Statutes. The changes to NRS 533.425(1) formalizing the issuance of certificates to multiple permit holders were included in the final version of S.B. 96. At the June 27, 1995, hearing before the Assembly Government Affairs Committee, a motion was made and passed to amend portions of S.B. 96 to add the words ''or joint holders'' to NRS 533.425(1). However the final version of the bill only contained the words ''or holders.''

While this fact is significant in determining the legislative intent, the plain language of the statute contemplates multiple or joint holders of permits and certificates. The Attorney General's opinion, as adopted by the State Engineer, concluded that because NRS 533.425(1) is subject to NRS 533.503, all of the multiple holders would have to meet the requirements of NRS 533.503. This is a reasonable construction and I would normally defer to the State Engineer's interpretation of the statute. However, in light of the serious constitutional implications, I conclude that only one of the joint holders of a permit or certificate need satisfy the requirements of NRS 533.503. Given this construction, Nevada's statutory scheme would not violate the Supremacy Clause of the federal Constitution.

## CONCLUSION

I conclude that the phrase ''legally entitled to place the livestock on the public lands for which the permit is sought'' in NRS 533.503, requires an applicant for a stockwater permit to have a legal or proprietary interest in the livestock to be watered under the permit. Thus, the BLM is not a qualified sole applicant under NRS 533.503, because it does not have a legal or proprietary interest in the livestock to be watered. I further conclude that NRS 533.503 does not bar the State Engineer from issuing joint permits or certificates of appropriation so long as one of the joint holders satisfies NRS 533.503. As construed, NRS 533.503 is constitutional. Accordingly, I would affirm the order of the district court denying the petition for judicial review.

However, the majority's construction of the statute is a reasonable, alternative means by which to avoid any constitutional infirmities. Moreover, I acknowledge that the United States Supreme Court, if presented with the issue, might conclude that defining "public lands" so as to target BLM managed lands is direct discrimination or regulation of the United States in violation of the Supremacy Clause. Thus I have no real disagreement with the majority's position. I simply believe a detailed analysis of the constitutional issues is important in the event that the Nevada Legislature decides to address concerns regarding the BLM in the future.