**137 Nev., Advance Opinion 2**

IN THE SUPREME COURT OF THE STATE OF NEVADA

TIM WILSON, P.E., NEVADA STATE
ENGINEER, DIVISION OF WATER
RESOURCES, DEPARTMENT OF
CONSERVATION AND NATURAL
RESOURCES,
Appellant,
vs.
PAHRUMP FAIR WATER, LLC, A
NEVADA LIMITED LIABILTY
COMPANY; STEVEN PETERSON, AN
INDIVIDUAL; MICHAEL LACH, AN
INDIVIDUAL; PAUL PECK, AN
INDIVIDUAL; BRUCE JABEOUR, AN
INDIVIDUAL; AND GERALD
SCHULTE, AN INDIVIDUAL,
Respondents.

No. 77722

FILED

FEB 25 2021

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order granting a petition for judicial review in a water law case. Fifth Judicial District Court, Nye County; Steven Elliott, Senior Judge.

*Reversed and remanded with instructions.*

Aaron D. Ford, Attorney General, and James N. Bolotin, Deputy Attorney General, Carson City,
for Appellant.

Taggart & Taggart, Ltd., and Paul G. Taggart and David H. Rigdon, Carson City,
for Respondents.

21-05563

Parsons Behle & Latimer and Gregory H. Morrison, Reno; Jesse J. Richardson, Morgantown, West Virginia,
for Amici Curiae Nevada Groundwater Association and Water Systems Council.

---

BEFORE THE COURT EN BANC.

## OPINION

By the Court, PICKERING, J.:

This appeal involves a question of survival for certain rural communities in this, "the driest state in the Nation," *United States v. State Eng'r*, 117 Nev. 585, 592, 27 P.3d 51, 55 (2001) (Becker, J., concurring in part and dissenting in part)—that is, the availability and sustainability of groundwater sourced from domestic wells. Specifically at issue is Order No. 1293A (July 12, 2018) by the appellant State Engineer, which prohibits the drilling of new domestic wells in the over-appropriated Pahrump Artesian Basin (the Basin) unless the applicant identifies and relinquishes 2.0 acre-feet annually from an alternate source (the 2.0 afa requirement). By seeking to enforce the 2.0 afa requirement, the State Engineer raises the interrelated questions of whether (1) Nevada law authorized the requirement in the first instance, given that the State Engineer both designated the Basin as in need of active management and determined that the drilling of new domestic wells would unduly impact existing wells, and (2) whether notice and hearing is required to impose the same, even in the face of the aforementioned determinations by the State Engineer.

We hold that Nevada law—specifically NRS 534.110(8) (allowing the State Engineer to "restrict the drilling of wells" in a specially designated basin "if the State Engineer determines that additional wells would cause an undue interference with existing wells")—authorized the 2.0 afa requirement under these particular circumstances, the State Engineer's assessment of which is supported by substantial evidence. Moreover, water is a public resource in this state, not private property, *see Mineral Cty. v. Lyon Cty.*, 136 Nev., Adv. Op. 58, 473 P.3d 418, 426 (2020), and because Nevada's resulting system of prior appropriation neither envisions nor guarantees that there will be enough water to meet every demand for it, a landowner's unilateral assumptions to the contrary are not the sort of justified reliance that would demand notice and a hearing prior to the State Engineer's imposition of the restriction at issue. Accordingly, we reverse the district court's decision, which invalidated Order No. 1293A as unlawful, and reinstate the same.

I.

Quantified in units of acre-feet (the volume of water it would take to cover an acre to a depth of one foot), the Basin's sustainable yield is 20,000 acre-feet annually (afa). *See* Nye Cty. Water Dist. Staff & Groundwater Mgmt. Plan Comm. Members, *Pahrump Basin 162 Groundwater Management Plan* 6 (Oct. 16, 2015) (2015 GWMP); *id.* app. R at 5 (defining acre-foot). However, there are about 60,000 afa currently allocated for permitted uses in the Basin, and there are additionally 11,280 existing domestic wells operating in the Basin without a permit. *See* Nye Cty. Water Dist., *Pahrump Basin 162 Groundwater Management Plan* 5-10 (Feb. 2018) (2018 GWMP). These domestic wells add up to 22,000 afa (2 afa

per domestic well, as allowed by statute) to the allocation imbalance, for a total allocation of, roughly, 82,000 afa. Adding still to the Basin's over-allocation problem are potential future domestic wells, which the 82,000-afa figure does not include. Based on land availability, there is a potential for more than 8,500 additional domestic wells (totaling potential commitments of up to 17,000 afa, at 2 afa per domestic well), *see* 2015 GWMP 7, which, left unchecked, would lead to a possible total commitment of nearly 100,000 afa—an amount five times the Basin's sustainable yield.

Although it remains over-allocated, the Basin is not over-pumped. *See* 2015 GWMP 6 (estimating that actual withdraws totaled 14,348 afa in 2013). For one, not all water-rights owners currently exercise the full allotment of those rights every year, and among the allotted rights are about 8,000 afa that have been permanently relinquished to support new development under Nye County Code. *See* 2018 GWMP 5; *see also* Nye County Code § 16.28.170(H) (2018) (requiring the purchase and relinquishment of existing water allocations before the creation of a new parcel or subdivision intended for residential use). Moreover, the average actual draw per domestic well is estimated to be just 0.5 afa out of the statutorily permitted 2 afa. *See* 2015 GWMP 7. However, problems and uncertainty remain, given the high density of domestic wells in Pahrump, the lingering effects of historical over-pumping, and the prospect of additional growth and associated housing density.

Such concerns are long-standing—the State Engineer first designated a portion of the Basin as an area in need of heightened regulation (now referred to as an "area of active management") 80 years ago. *See* State Engineer Order No. 176 (Mar. 11, 1941). The State Engineer

has since expanded that designation to encompass the entire Basin. *See* State Engineer Order No. 1252 (Apr. 29, 2015). And the Basin's water supply is now entirely subject to the State Engineer's "particularly close monitoring and regulation." NRS 534.011; *see* NRS 534.030(1) (providing the procedure for the State Engineer to designate a basin as an area of active management).

Accordingly, the State Engineer and Nye County have coordinated to undertake conservation action in the Basin. To wit, in 2004, Nye County created a Water Resources Plan, outlining strategies for meeting the county's projected water needs over the next 50 years. *See* Thomas S. Buqo, Dep't of Nat. Res. & Fed. Facilities, *Nye County Water Resources Plan* 1 (Aug. 2004). And, in 2014, Nye County formed an advisory committee to address over-appropriation in the Basin and created a Groundwater Management Plan, which provided a list of proposed measures, noting a need for more information and recognizing two main concerns: over-allocation and the effect of densely clustered domestic wells. *See* 2015 GWMP 4-10. Then, in 2016, the Nye County Water District (NCWD) took action under that plan and requested, as a component of that action, that the State Engineer issue an order requiring relinquishment of existing water rights before new domestic wells could be drilled in the Basin. *See* 2018 GWMP 4 (discussing the letter).

The State Engineer determined that any drilling of new wells in the Basin would unduly interfere with existing wells. Accordingly, and as relevant here, the State Engineer responded to NCWD's request by issuing Order No. 1293 (Dec. 19, 2017), which contained the 2.0 afa requirement:

> [T]he drilling of any new domestic well within the Pahrump Artesian Basin is prohibited, except that . . . [a]ny person proposing to drill a new domestic well must obtain an existing water right . . . of not less than 2.0 [afa] and relinquish the water right to serve the domestic well.

(Emphasis omitted.) The State Engineer issued Order No. 1293 without notice, and it took immediate effect on December 19, 2017. Pursuant to the order, the State Engineer denied 22 notices of intent to drill domestic wells that had been filed between December 15 and December 19, 2017 (i.e., before or on the order's effective date). Respondents, Pahrump Fair Water, LLC and several of its individual members (PFW), challenged Order No. 1293 via a petition for judicial review, and the district court heard testimony in a hearing on the matter.

Before the district court ruled on Order No. 1293, the State Engineer voluntarily revoked the order and issued an amended order, Order No. 1293A, which PFW challenged in a separate petition for judicial review that led to this appeal. Order No. 1293A was almost entirely identical to Order No. 1293—including the 2.0 afa requirement—except that it exempted from the 2.0 afa requirement (1) the 22 notices of intent to drill filed between December 15 and December 19 and (2) any person who had filed either a zoning or building application as of December 19, 2017. After granting PFW's motion to include a supplemental record containing the testimony and pleadings filed in the prior challenge to Order No. 1293,[1] the

---

[1] This was appropriate, despite the State Engineer's argument to the contrary, given the close connection between the proceedings on Order Nos. 1293 and 1293A. *See Occhiuto v. Occhiuto*, 97 Nev. 143, 145, 625 P.2d 568, 569 (1981) (noting that the district court may take judicial notice of closely related proceedings); *see also* NRS 47.150 (authorizing courts to take judicial notice).

district court granted PFW's petition and invalidated Order No. 1293A, concluding that the State Engineer violated due process by issuing the order without first providing notice and a public hearing, that the State Engineer lacked authority to issue the 2.0 afa requirement, and that substantial evidence did not support the order. In light of these determinations, the district court declined to reach PFW's claim that Order No. 1293A is an unconstitutional taking.[2] This appeal followed.

## II.

## A.

"The Legislature has established a comprehensive statutory scheme regulating the procedures for acquiring, changing, and losing water rights in Nevada." *Mineral Cty. v. Lyon Cty.*, 136 Nev., Adv. Op. 58, 473 P.3d 418, 426 (2020). The State Engineer's powers thereunder are limited to "only those . . . which the legislature expressly or implicitly delegates." *Clark Cty. v. State, Equal Rights Comm'n*, 107 Nev. 489, 492, 813 P.2d 1006, 1007 (1991); *see Howell v. Ricci*, 124 Nev. 1222, 1230, 197 P.3d 1044, 1050 (2008) (noting that the State Engineer cannot act beyond his or her statutory authority). Accordingly, the scope of the State Engineer's

---

[2]As the parties acknowledge, the takings issue is not properly before this court. Because the district court did not reach the issue, the State Engineer did not raise it on direct appeal. PFW asks that, in the event of reversal, the court remand the takings issue for the district court to resolve in the first instance.

authority here is a question of statutory interpretation, subject to de novo review. *See Town of Eureka v. Office of State Eng'r*, 108 Nev. 163, 165-66, 826 P.2d 948, 949-50 (1992) (noting that the State Engineer's interpretation of his authority may be persuasive but is not controlling and "the reviewing court may undertake independent review" of questions of statutory construction). And the plain meaning of the relevant text guides the answer. *Coast Hotels & Casinos, Inc. v. Nev. State Labor Comm'n*, 117 Nev. 835, 840, 34 P.3d 546, 550 (2001).

As statutory authority for the determination that new domestic wells in the Basin would interfere with existing wells, the State Engineer relies, in part, upon NRS 534.110(8), which provides as follows:

> In any basin or portion thereof in the State designated by the State Engineer, the State Engineer *may restrict drilling of wells in any portion thereof if the State Engineer determines that additional wells would cause an undue interference with existing wells.* Any order or decision of the State Engineer so restricting drilling of such wells may be reviewed by the district court of the county pursuant to NRS 533.450.

(Emphasis added.)[3] A straightforward reading of NRS 534.110(8) supports the State Engineer's 2.0 afa requirement—the section expressly permits the State Engineer to restrict the drilling of "additional wells" under

------

[3]The State Engineer also claimed authority under NRS 534.120(1) (stating that in a designated basin that is "being depleted, the State Engineer in his or her administrative capacity may make such rules, regulations and orders as are deemed essential for the welfare of the area involved"), but because we conclude that the State Engineer has authority under NRS 534.110(8), we need not reach this argument.

circumstances that the State Engineer found here,[4] and the 2.0 afa requirement restricts the drilling of additional *domestic* wells, which the phrase "additional wells" implicitly includes as a subset. *See, e.g., ASAP Storage, Inc. v. City of Sparks*, 123 Nev. 639, 646, 173 P.3d 734, 739 (2007) (holding that "private property" plainly included personal property because the constitutional provision at issue did not include any "language to justify excluding personal property from its scope").

Indeed, there is only a plausible question as to the scope of the State Engineer's power in this instance because of the complicated history of domestic wells in this state's prior appropriative system. Specifically, when the Legislature initially abrogated Nevada's common-law doctrine of riparian rights, the rudimentary initial system of statutes entirely excluded domestic wells from its restrictions and coverage. *See* 1939 Nev. Stat., ch. 178, § 3, at 274-75 (stating that "[t]his act shall not apply to the develop[ment] and use of underground water for domestic purposes") (now codified as NRS 534.180(1) (stating that "this chapter does not apply in the matter of obtaining permits for the development and use of underground water from a well for domestic purposes where the draught does not exceed 2 [afa]")).

But the Legislature progressively chipped away at, and ultimately eliminated, this once broad exclusion of domestic wells from Nevada's statutory water laws. *See Mineral Cty.*, 136 Nev., Adv. Op. 58, 473 P.3d at 426 n.5 (noting that the State Engineer has jurisdiction over "all underground waters in the state"). First, by making it plain that even

---

[4]The relevant findings are reviewed in Part II(B), *infra*.

domestic wells are subject to prior appropriation rules and curtailment under NRS Chapter 534 if the basin in which they are located runs dry. *See* NRS 530.110(6); NRS 534.120(3); *see also* 1955 Nev. Stat., ch. 212, § 10.5, at 331-32 (authorizing the State Engineer to restrict the drilling of domestic wells in depleted basins under certain circumstances). Then, by statutorily establishing priority dates for domestic wells, according to the date of their drilling, and the beneficial use of the water thereunder. *See* NRS 534.080(4); *see also* 2007 Nev. Stat., ch. 246, § 2, at 843 (enacting NRS 534.080(4)). And finally, by clarifying that following any curtailment in a designated basin, those with preexisting domestic wells can still draw .5 afa, without regard to priority date. *See* NRS 534.110(9); *see also* 2019 Nev. Stat., ch. 304, § 1, at 1790 (enacting NRS 534.110(9)).

Because these amendments completely brought domestic wells into the prior appropriative system, and NRS Chapter 534 and NRS 534.110 in particular, the general reference to "wells" in NRS 534.110(8) necessarily encompasses such wells. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) (noting that absent some indication to the contrary "general words . . . are to be accorded their full and fair scope"). Indeed, "[t]he presumed point" of the Legislature's use of the general word "wells" in NRS 534.110(8) was "to produce general coverage," including over domestic wells, which are now undeniably subject to NRS Chapter 534's edicts, "not to leave room for courts to recognize ad hoc exceptions." *See id.* Any remnants of the prior across-the-board exclusion that can arguably be read inappositely—for instance, PFW cites NRS 534.030(4) (stating that "[t]he State Engineer shall supervise all wells . . . , except those wells for domestic purposes")—are as a palimpsest,

overwritten by the Legislature and the amendments it has made to NRS Chapter 534 discussed above.

## B.

Beyond the question of facial statutory authority addressed above, the State Engineer's decision must be supported by substantial record evidence. *See King v. St. Clair*, 134 Nev. 137, 139, 414 P.3d 314, 316 (2018) (stating that "factual findings of the State Engineer should only be overturned if they are not supported by substantial evidence"). Of specific relevance here is the State Engineer's critical requisite determination that the drilling of any new domestic wells in the Basin would threaten the supply of water to existing wells. The evidence supporting this finding is substantial if a reasonable mind would accept it as adequate support for the conclusion. *See id.*

The thrust of the dispute here is the adequacy of a 2017 study of the Basin by John Klenke (the Klenke study) relied upon by the State Engineer. The Klenke study assumed for methodological purposes that no new domestic wells would be drilled in the Basin and still concluded that well failures would likely result even under then-existing conditions. *See* John Klenke, Nye Cty. Water Dist., *Estimated Effects of Water Level Declines in the Pahrump Valley on Water Well Longevity*, at vi (Jan. 2017). Accordingly, PFW's point that the Klenke study did not expressly examine the effect of new domestic wells is taken, but under the substantial evidence standard, support for the State Engineer's findings is not so limited—the State Engineer has authority to draw reasonable inferences from such evidence. *See* 4 Charles H. Koch, Jr., *Administrative Law and Practice* § 11:24 [4] (3d ed. 2010) (explaining that an agency has "the power to draw

inferences from the facts"); *see also id.* § 5:64 [3] (noting that "circumstantial evidence can satisfy the substantial evidence standard"). And here, the State Engineer could reasonably infer that new wells would unduly interfere with existing wells despite the Klenke study's limitations, based on its results: if the Basin's wells are likely to fail even absent new drilling, then it reasonably follows that additional drilling in the Basin would only increase that likelihood.

Moreover, "neither the district court nor this court will substitute its judgment for that of the State Engineer." *Revert v. Ray*, 95 Nev. 782, 786, 603 P.2d 262, 264 (1979). And our deference is especially warranted under these circumstances because the factual question under NRS 534.110(8) of "undue interference"—a term left undefined by the Legislature—is technical and scientifically complex. Indeed, "[w]hen examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential" because such conclusions are "within [the agency's] area of special expertise, at the frontiers of science." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). Accordingly, the instant record is of similar substance to that of others that have sufficiently supported a finding and action by the State Engineer. *See, e.g., Pyramid Lake Paiute Tribe of Indians v. Ricci*, 126 Nev. 521, 527, 245 P.3d 1145, 1149 (2010) (upholding State Engineer's finding that approval of change use application would not be detrimental to the public interest when State Engineer limited pumping to the available perennial yield based on the State Engineer's findings regarding the perennial yield); *Griffin v. Westergard*, 96 Nev. 627, 630-32, 615 P.2d 235, 236-38 (1980) (concluding that substantial evidence, in the

SUPREME COURT
OF
NEVADA

(O) 1947A

form of studies regarding the amount of available groundwater, supported the finding that the basin at issue was already over-appropriated and affirming the denial of groundwater applications on that basis).

Nor was, as PFW argues, the State Engineer required to hold a hearing or develop a more robust record. True, there are general requirements under Nevada's Administrative Procedure Act (the APA), NRS Chapter 233B, for substantive rulemaking, *see* NRS 233B.0395-.120 (Administrative Regulations), but the State Engineer is "entirely exempted from [the APA's] requirements." NRS 233B.039(1)(i). And, as established above, the State Engineer complied with the relevant statutory authority in issuing Order No. 1293A. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 547 (1978) (instructing that "the adequacy of the 'record' [supporting an agency decision] is not correlated directly to the type of procedural devices employed, but rather turns on whether the agency has followed the statutory mandate of . . . relevant statutes"); *see also Application of Filippini*, 66 Nev. 17, 27, 202 P.2d 535, 540 (1949) (observing that it is "settled in this state that the water law and all proceedings thereunder are special in character, and the provisions of such law not only lay down the method of procedure but strictly limits it to that provided"); 1 Charles H. Koch, Jr., *Administrative Law and Practice* § 4:10 [1] (3d ed. 2010) (recognizing that, in the absence of due process requirements, "the statutory procedures do not provide a minimum but rather provide the complete procedural requirement" for administrative acts).

## C.

No one "shall be deprived of life, liberty, or property, without due process of law." Nev. Const. art. 1, § 8(2); *see* U.S. Const. amend. XIV, § 1 (prohibiting any state from depriving "any person of life, liberty, or property, without due process of law"). Accordingly, where it attaches, "[p]rocedural due process requires that parties receive 'notice and an opportunity to be heard.'" *Eureka Cty. v. Seventh Judicial Dist. Court (Sadler Ranch)*, 134 Nev. 275, 279, 417 P.3d 1121, 1124 (2018) (quoting *Callie v. Bowling*, 123 Nev. 181, 183, 160 P.3d 878, 879 (2007)); *see also, e.g., Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972). And the State Engineer acknowledges that he issued Order No. 1293A without providing notice or a hearing—an omission that, in the context of established water rights, would unquestionably be fatal. *See, e.g., Sadler Ranch*, 134 Nev. at 279, 417 P.3d at 1124 ("In Nevada, water rights are 'regarded and protected as real property.'") (quoting *Filippini*, 66 Nev. at 21-22, 202 P.2d at 537).

However, Order No. 1293A does not limit established water rights, instead only imposing a condition on the drilling of new domestic wells in the designated basin—wells for which permit applications had not even been filed. And, under Nevada's system of prior appropriation, the owner of land does not have an established property right in the untapped groundwater lying thereunder. Ross E. deLipkau & Earl M. Hill, *The Nevada Law of Water Rights* 6-3 to 6-4 (2010) ("The doctrine of absolute ownership of [groundwater] by the owner of the land is plainly a facet of the repudiated doctrine of riparianism, and in conflict with Nevada's current law of statutory appropriation."); John W. Anderson & John L. Davis, *Water and Mineral Development Conflicts*, 32 Rocky Mtn. Min. L. Inst. 9, at § 9.05

SUPREME COURT
OF
NEVADA

(O) 1947A

14

(1986) (noting that "[u]nder the [prior] appropriation system, a landowner has no rights to the water underlying his land by virtue of his land ownership"); *see State ex rel. Hinckley v. Sixth Judicial Dist. Court*, 53 Nev. 343, 352, 1 P.2d 105, 107 (1931) (noting that, in Nevada and other prior appropriation states, it is well established that "no title can be acquired to the public waters of the state by capture or otherwise"); *see also, e.g., Town of Chino Valley v. City of Prescott*, 638 P.2d 1324, 1328 (Ariz. 1981) ("[T]here is no right of ownership of groundwater in Arizona . . . and . . . the right of the owner of the overlying land is simply to the [use] of the water."); *City of Santa Maria v. Adam*, 149 Cal. Rptr. 3d 491, 502 (Ct. App. 2012), ("Appropriative rights . . . are not derived from land ownership . . . ."), *cert. denied*, 571 U.S. 940 (2013); *Yeo v. Tweedy*, 286 P. 970, 973 (N.M. 1929) (rejecting the proposition that regulation of property owners' groundwater amounted to a taking of vested rights); *Knight v. Grimes*, 127 N.W.2d 708, 711 (S.D. 1964) ("The notion that this right to take and use [ground]water constitutes an actual ownership of the water prior to withdrawal has been demonstrated to be legally fallacious."); *Stubbs v. Ercanbrack*, 368 P.2d 461, 463 (Utah 1962) (holding that the right to make use of one's land and the right to use the groundwater thereunder are "severable things").

Of course, even in the absence of vested property rights, limited constitutional procedural protections may be available for established expectancy interests, "defined in part by individual expectations and personal reliance interests." Alan Brownstein, *Constitutional Wish Granting and the Property Rights Genie*, 13 Const. Comment. 7, 37 (1996). But a property owner in a basin that has been over-allocated for decades, and where new wells threaten the supply of existing wells, could not

legitimately expect to be able to arbitrarily drill and pump even 2 afa or less without any restrictions, such that formal notice and hearing are plainly required. *See Perry v. Sindermann*, 408 U.S. 593, 600 (1972) (holding that a "mere subjective 'expectancy' [is not] protected by procedural due process"); *see also Fox v. Skagit Cty.*, 372 P.3d 784, 796 (Wash. Ct. App. 2016) ("That some water rights must necessarily acquiesce to senior water rights is a natural consequence of the prior appropriation doctrine."). Indeed, homeowners with vested rights in established domestic wells in the Basin, who already may depend on that water supply to support their household and family, and whose wells the new domestic wells threaten, have much weightier interests in that supply—whether framed in terms of established property rights or reasonable reliance. *See* NRS 533.024(1)(b) (stating that "[i]t is the policy of this State . . . [t]o recognize the importance of domestic wells as appurtenances to private homes, [and] to create a protectable interest in such wells"); NRS 534.080(4) (establishing that the date of priority for domestic use is the date of the domestic well's completion); *see also Mineral Cty.*, 136 Nev., Adv. Op. 58, 473 P.3d at 426 ("Nevada's water statutes embrace prior appropriation as a fundamental principle. Water rights are given subject to existing rights . . . , given dates of priority . . . , and determined based on relative rights . . . .") (internal citations and quotations omitted).

In sum, the State Engineer was not required to provide notice and a hearing regarding the 2.0 afa requirement under the particular circumstances. Accordingly, in light of this and the foregoing sections, the district court improperly invalidated Order No. 1293A. We therefore reverse the district court's order granting PFW's petition for judicial review,

reinstate Order No. 1293A, and, at PFW's request, *see* note 2, *supra*, remand with instructions for the district court to consider its takings claim in the first instance. The stay previously ordered by this court is vacated.

_____, J.
Pickering

We concur:

_____, C.J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Cadish

_____, J.
Silver

_____, J.
Herndon

SUPREME COURT
OF
NEVADA

(O) 1947A