'140 Nev., Advance Opinion 4

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| ADAM SULLIVAN, P.E., NEVADA STATE ENGINEER, DIVISION OF WATER RESOURCES, DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES, Appellant, vs. LINCOLN COUNTY WATER DISTRICT; VIDLER WATER COMPANY, INC.; COYOTE SPRINGS INVESTMENT, LLC; NEVADA COGENERATION ASSOCIATES NOS. 1 AND 2; APEX HOLDING COMPANY, LLC; DRY LAKE WATER, LLC; GEORGIA-PACIFIC GYPSUM, LLC; REPUBLIC ENVIRONMENTAL TECHNOLOGIES, INC.; SIERRA PACIFIC POWER COMPANY, D/B/A NV ENERGY; NEVADA POWER COMPANY, D/B/A NV ENERGY; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; MOAPA VALLEY WATER DISTRICT; WESTERN ELITE ENVIRONMENTAL, INC.; BEDROC LIMITED, LLC; AND CITY OF NORTH LAS VEGAS, Respondents. | No. 84739 FILED JAN 25 2024 ELIZABETH A. BROWN CLERK OF SUPREME COURT BY _____ CHIEF DEPUTY CLERK |
| SOUTHERN NEVADA WATER AUTHORITY, Appellant, vs. LINCOLN COUNTY WATER DISTRICT; VIDLER WATER COMPANY, INC.; COYOTE SPRINGS INVESTMENT, LLC; NEVADA COGENERATION ASSOCIATES NOS. 1 AND 2; APEX HOLDING COMPANY, LLC; DRY LAKE | No. 84741 |

24·02906

WATER, LLC; GEORGIA-PACIFIC GYPSUM, LLC; REPUBLIC ENVIRONMENTAL TECHNOLOGIES, INC.; SIERRA PACIFIC POWER COMPANY, D/B/A NV ENERGY; NEVADA POWER COMPANY, D/B/A NV ENERGY; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; MOAPA VALLEY WATER DISTRICT; WESTERN ELITE ENVIRONMENTAL, INC.; BEDROC LIMITED, LLC; AND CITY OF NORTH LAS VEGAS,
Respondents.

CENTER FOR BIOLOGICAL DIVERSITY,
Appellant,
vs.
LINCOLN COUNTY WATER DISTRICT; VIDLER WATER COMPANY, INC.; COYOTE SPRINGS INVESTMENT, LLC; NEVADA COGENERATION ASSOCIATES NOS. 1 AND 2; APEX HOLDING COMPANY, LLC; DRY LAKE WATER, LLC; GEORGIA-PACIFIC GYPSUM, LLC; REPUBLIC ENVIRONMENTAL TECHNOLOGIES, INC.; SIERRA PACIFIC POWER COMPANY, D/B/A NV ENERGY; NEVADA POWER COMPANY, D/B/A NV ENERGY; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; MOAPA VALLEY WATER DISTRICT; WESTERN ELITE ENVIRONMENTAL, INC.; BEDROC LIMITED, LLC; AND CITY OF NORTH LAS VEGAS,
Respondents.

No. 84742

SUPREME COURT
OF
NEVADA

(O) 1947A

MUDDY VALLEY IRRIGATION
COMPANY,
Appellant,
vs.
LINCOLN COUNTY WATER DISTRICT;
VIDLER WATER COMPANY, INC.;
COYOTE SPRINGS INVESTMENT,
LLC; NEVADA COGENERATION
ASSOCIATES NOS. 1 AND 2; APEX
HOLDING COMPANY, LLC; DRY LAKE
WATER, LLC; GEORGIA-PACIFIC
GYPSUM, LLC; REPUBLIC
ENVIRONMENTAL TECHNOLOGIES,
INC.; SIERRA PACIFIC POWER
COMPANY, D/B/A NV ENERGY;
NEVADA POWER COMPANY, D/B/A
NV ENERGY; THE CHURCH OF
JESUS CHRIST OF LATTER-DAY
SAINTS; MOAPA VALLEY WATER
DISTRICT; WESTERN ELITE
ENVIRONMENTAL, INC.; BEDROC
LIMITED, LLC; AND CITY OF NORTH
LAS VEGAS,
Respondents.

No. 84809

COYOTE SPRINGS INVESTMENT,
LLC; LINCOLN COUNTY WATER
DISTRICT; AND VIDLER WATER
COMPANY, INC.,
Appellants,
vs.
ADAM SULLIVAN, P.E., NEVADA
STATE ENGINEER, DIVISION OF
WATER RESOURCES, DEPARTMENT
OF CONSERVATION AND NATURAL
RESOURCES,
Respondent.

No. 85137

Consolidated appeals from a district court order granting petitions for judicial review in a water law matter and from a post-judgment order denying motions for attorney fees. Eighth Judicial District Court, Clark County; Bita Yeager, Judge.

*Affirmed in part, reversed in part, and remanded.*

Aaron D. Ford, Attorney General, Heidi Parry Stern, Solicitor General, Jeffrey M. Conner and Kiel B. Ireland, Deputy Solicitors General, and James N. Bolotin, Senior Deputy Attorney General, Carson City,
for Adam Sullivan, P.E., Nevada State Engineer.

Taggart & Taggart, Ltd., and Paul G. Taggart and Thomas P. Duensing, Carson City; Steven C. Anderson, Las Vegas,
for Southern Nevada Water Authority.

Scott Lake, Reno,
for Center for Biological Diversity.

Dotson Law and Robert A. Dotson and Justin C. Vance, Reno; Steven D. King, Dayton,
for Muddy Valley Irrigation Company.

Dylan V. Frehner, District Attorney, Lincoln County; Great Basin Law and Wayne O. Klomp, Reno,
for Lincoln County Water District.

Allison MacKenzie, Ltd., and Karen A. Peterson and Alida C. Mooney, Carson City,
for Vidler Water Company, Inc.

Robison, Sharp, Sullivan & Brust and Kent R. Robison and Hannah E. Winston, Reno; Brownstein Hyatt Farber Schreck, LLP, and Bradley J. Herrema, Las Vegas; Coulthard Law PLLC and William L. Coulthard, Las Vegas; Wingfield Nevada Group and Emilia K. Cargill, Coyote Springs,
for Coyote Springs Investment, LLC.



Dyer Lawrence, LLP, and Francis C. Flaherty and Sue S. Matuska, Carson City,
for Nevada Cogeneration Associates Nos. 1 and 2.

Kaempfer Crowell and Severin A. Carlson and Sihomara L. Graves, Reno,
for The Church of Jesus Christ of Latter-Day Saints.

Marquis Aurbach and Christian T. Balducci, Las Vegas,
for Apex Holding Company, LLC, and Dry Lake Water, LLC.

McDonald Carano LLP and Lucas Foletta, Sylvia Harrison, and Jane Susskind, Reno,
for Georgia-Pacific Gypsum, LLC, and Republic Environmental Technologies, Inc.

Parsons Behle & Latimer and Gregory H. Morrison, Reno,
for Moapa Valley Water District.

Schroeder Law Offices, P.C., and Laura A. Schroeder, Caitlin R. Skulan, and Therese A. Ure Stix, Reno,
for Bedroc Limited, LLC, City of North Las Vegas, and Western Elite Environmental, Inc.

Timothy M. Clausen and Michael D. Knox, Reno,
for Sierra Pacific Power Company.

---

BEFORE THE SUPREME COURT, EN BANC.

## *OPINION*

By the Court, LEE, J.:

This case examines whether the State Engineer has the authority to redesignate multiple existing hydrographic basins as one "superbasin" based on a shared source of water for purposes of the water's




administration and management. We also look at whether the State Engineer complied with due process in creating the superbasin at issue here.

In Order 1309, the State Engineer determined that the waters of seven basins were interconnected in a manner such that withdrawals from one basin affected the amount of water in the other basins. Consequently, the State Engineer combined those basins, for administration purposes, into one superbasin. Further, the previously granted appropriations of water exceeded the rate of recharge in the superbasin, now known as the Lower White River Flow System (LWRFS). The State Engineer found that permitted groundwater pumping from that flow system may reduce the amount of water available to parties with vested surface water rights, including rights to waters from the Muddy River, a vital source of water for Las Vegas. Additionally, the State Engineer determined that no more than 8,000 afa, and perhaps less, could be appropriated from the flow system without affecting the vested rights and other public interests.

Respondents, owners of water rights throughout the new superbasin, petitioned for judicial review in the district court, alleging that the State Engineer lacks authority to conjunctively manage surface waters and groundwater and to jointly administer the multiple basins that form the LWRFS. They also asserted that the State Engineer violated their due process rights in issuing Order 1309. The district court largely agreed with respondents and granted their petitions for judicial review. The State Engineer and others interested in the flow of water throughout the LWRFS appealed.

We hold that the State Engineer has authority to conjunctively manage surface waters and groundwater and to jointly administer multiple basins and thus was empowered to issue Order 1309. We also conclude that the State Engineer did not violate due process protections because respondents received notice and had an opportunity to be heard. Accordingly, we reverse the district court's order insofar as it granted respondents' petitions for judicial review and dismissed appellants' petitions for judicial review and remand this matter to the district court for further proceedings as to the State Engineer's factual determinations. We further affirm in part and reverse in part the district court's conflicting order on whether appellants had notice that the State Engineer would adjudicate the absence of a conflict to Muddy River rights. Finally, we do not reach the merits of the attorney fees issue here, given our reversal of the order granting petitions for judicial review.

## FACTS AND PROCEDURAL HISTORY

In 2001, the State Engineer considered pending applications to appropriate groundwater from several basins that sit just north of Las Vegas. The groundwater is from an underground water resource known as the carbonate rock aquifer system, or the LWRFS, a large area of underground water whose rate of recharge and boundaries were unknown at the time. The State Engineer held those applications in abeyance and instead issued Order 1169. In Order 1169, he opined that groundwater in the various basins originated from the same carbonate rock aquifer system and that pumping groundwater from one basin might reduce the flow of water to other basins, including to the springs supplying the fully

(O) 1947A

appropriated Muddy River.[1] He indicated that it was unclear how much additional groundwater could be appropriated without causing adverse effects throughout the LWRFS. In order to determine the effects of additional pumping, the State Engineer ordered water rights holders in Coyote Springs Valley, one of the subject basins, to conduct a pump test to obtain further information by stressing the aquifer. During the pump test, the water rights holders in Coyote Springs Valley pumped at least 50% of their permitted water rights over a period of two years.

Based on the results of the pump test, the State Engineer issued Order 1169A in 2012. In that order, the State Engineer determined that the increased pumping resulted in an unprecedented decrease in water flow to the highest elevation springs fed by the carbonate rock aquifer system.

The State Engineer found that the pump test measurably reduced flows in the headwater springs that feed the Muddy River, which was fully appropriated for use prior to 1905 under the Muddy River Decree. Rights holders under the Muddy River Decree hold prestatutory vested water rights, and the State Engineer is statutorily required to not impair these types of water rights. Further, the springs and tributary headwaters of the Muddy River are the only habitat of the Moapa Dace, a fish protected under the Endangered Species Act. As a result, the State Engineer acknowledged that groundwater pumping in the subject basins could negatively impact Muddy River surface water rights holders and the public interest.

---

[1]"'Aquifer' means a geological formation or structure that stores or transmits water, or both." NRS 534.0105.

Moreover, the State Engineer found that the pump test impacts were widespread, extending far beyond the Coyote Springs Valley pump test sites to multiple nearby basins, including Kane Springs Valley, Hidden Valley, Garnet Valley, the Muddy River Springs Area, California Wash, and a small part of the Black Mountains Area (the Subject Basins), all of which, with the exception of Kane Springs Valley, the State Engineer had previously designated as individual basins for the purposes of administration. As a result, he concluded the pump test provided clear proof of the close hydrologic connection of the Subject Basins, with the notable omission of Kane Springs Valley. The State Engineer then determined that all the Subject Basins, except Kane Springs Valley and the Black Mountains Area, shared the same perennial yield and held no unappropriated groundwater.[2] He consequently denied hundreds of applications for further appropriations of groundwater throughout the Subject Basins based on his conclusion that there was no unappropriated water remaining in the source of supply.[3]

---

[2]It appears that the State Engineer suspected Kane Springs Valley and a portion of the Black Mountains Area were a part of the LWRFS but did not have enough information at the time to incorporate them in the LWRFS for the purposes of further administration. The Black Mountains Area was considered for management with the rest of the superbasin in Order 1303, and Kane Springs Valley was added in Order 1309.

[3]In issuing Order 1169A, the State Engineer found that the Muddy River was supplied by springs that recharge from groundwater in carbonate rocks and that the area of recharge included other nearby topographical areas throughout the LWRFS. As a result, groundwater pumping from the LWRFS in the Subject Basins may reduce the springs' discharge and thus reduces the flow of the Muddy River itself.

Thereafter, in 2019, the State Engineer began addressing concerns that the carbonate aquifer was over-appropriated by *existing* groundwater rights. He issued Order 1303, designating the Subject Basins, with the exception of Kane Springs Valley, as a "joint administrative unit for purposes of administration of water rights" called the "Lower White River Flow System." Instead of administering water rights separately within each of the previously recognized six basins, the State Engineer reordered and administered water rights throughout the newly created LWRFS based upon the respective priority dates throughout the entirety of the LWRFS.

The State Engineer further solicited reports from water rights holders on the following topics: (a) the geographic boundary of the LWRFS; (b) information related to the pump test, Muddy River headwater spring flow, and aquifer recovery; (c) the long-term annual quantity of groundwater that may be pumped from the LWRFS; (d) the effect of moving water rights between wells on senior decreed rights to the Muddy River; and (e) any other matter believed to be relevant. Lastly, Interim Order 1303 announced a future administrative hearing and held applications to change existing groundwater rights in abeyance, issued a temporary moratorium on development and construction, and allowed rights holders to use the order to support extensions of time and prevent forfeitures.

*Order 1309*

Following the anticipated administrative hearing, and based on the scientific evidence and testimony presented, the State Engineer in 2020 issued the order challenged herein, Order 1309. Order 1309 in pertinent part delineated the LWRFS, this time including Kane Springs Valley, as a single hydrographic basin and determined that no more than 8,000 afa (and

perhaps less) could be pumped from that flow system without adversely affecting the Muddy River and Moapa Dace, providing:

> 1. The Lower White River Flow System consisting of the Kane Springs Valley, Coyote Spring Valley, Muddy River Springs Area, California Wash, Hidden Valley, Garnet Valley, and the northwest portion of the Black Mountains Area as described in this Order, is hereby *delineated as a single hydrographic basin*. The Kane Springs Valley, Coyote Spring Valley, Muddy River Springs Area, California Wash, Hidden Valley, Garnet Valley and the northwest portion of the Black Mountains Area are hereby established as *sub-basins within the Lower White River Flow System Hydrographic Basin*.
>
> 2. *The maximum quantity of groundwater that may be pumped* from the Lower White River Flow System Hydrographic Basin on an average annual basis *without causing further declines in Warm Springs area spring flow and flow in the Muddy River cannot exceed 8,000 afa and may be less*.
>
> 3. *The maximum quantity of water that may be pumped* from the Lower White River Flow System Hydrographic Basin *may be reduced* if it is determined that pumping will adversely impact the endangered *Moapa dace*.

(Emphases added.) Finally, Order 1309 lifted the moratorium on development and construction and also rescinded all other matters not addressed from Interim Order 1303, including the portion of Order 1303 that reordered rights throughout the LWRFS based on date of priority.

*Petitions for judicial review*

Water rights holders affected by Order 1309 petitioned the district court for judicial review under NRS 533.450, and the cases were consolidated. After oral argument, the district court granted respondents' petitions. The district court took judicial notice that, unlike the six other

Supreme Court
OF
Nevada

(O) 1947A

11

basins, Kane Springs Valley was not previously statutorily designated as a basin for administration. The district court found that the State Engineer exceeded his statutory authority when creating the LWRFS out of multiple distinct, already established hydrographic basins. The district court further found that the State Engineer lacked the statutory authority to conjunctively manage surface water and groundwater and to jointly administer multiple sub-basins within the LWRFS. Additionally, the district court determined that the State Engineer violated the water rights holders' constitutional right to due process by failing to provide adequate notice of the topics addressed at the hearing and a meaningful opportunity to be heard on the issues. The district court declined to reach whether the factual findings in Order 1309 were supported by substantial evidence. The district court later filed an addendum to the order, granting in part and dismissing in part the petition from the Southern Nevada Water Authority (SNWA) and dismissing the petitions from the Muddy Valley Irrigation Company (MVIC) and the Center for Biological Diversity (CBD), which had primarily challenged Order 1309 only insofar as it determined that the 8,000 afa pumping cap did not impact vested water rights.

The State Engineer appealed from the district court's decisions, as did SNWA, MVIC, and CBD.[4] Respondents are parties with appropriations throughout the LWRFS whose petitions for judicial review

_____

[4]To the extent that SNWA and MVIC challenge two paragraphs in Order 1309 as an adjudication that the order does not conflict with their rights under the Muddy River Decree, the State Engineer has agreed with them that any such determination exceeded the scope of the hearing notice and thus violated due process. We agree that such an adjudication exceeded the scope of the hearing notice and therefore affirm the partial grant of SNWA's petition and reverse the dismissal of MVIC's petition as discussed in the conclusion.

were granted by the district court. Certain respondents have separately appealed from a post-judgment order denying their motions for attorney fees. The appeals have been consolidated for the purposes of briefing, oral argument, and disposition.

## DISCUSSION

### Prior appropriation doctrine

"As the driest state in the Nation," Nevada long ago adopted the prior appropriation doctrine to allocate its water, "this most precious of natural resources." *United States v. State Eng'r*, 117 Nev. 585, 592, 27 P.3d 51, 55 (2001) (Becker, J., concurring in part and dissenting in part). "The prior appropriation doctrine grants an appropriative right that may be described as a state administrative grant that allows the use of a specific quantity of water for a specific beneficial purpose if water is available in the source free from the claims of others with earlier appropriations." *Mineral County v. Lyon County*, 136 Nev. 503, 509, 473 P.3d 418, 423 (2020) (internal quotations and alterations omitted). "The doctrine of prior appropriation . . . is itself largely a product of the compelling need for certainty in the holding and use of water rights." *Arizona v. California*, 460 U.S. 605, 620 (1983), *decision supplemented*, 466 U.S. 144 (1984). Both surface water and groundwater are subject to the doctrine of prior appropriation. *Cappaert v. United States*, 426 U.S. 128, 142 (1976). "Nevada's supply of water, even with the most effective management tools, is often insufficient to supply the state's needs," and thus, "allowing water to be controlled by individual landowners was deemed to be harmful to the public at large." *United States v. State Eng'r*, 117 Nev. at 592, 27 P.3d at 55 (Becker, J., concurring in part and dissenting in part). As a result, "[t]he water of *all* sources of water supply" in Nevada "belongs to the public," and




the State Engineer administers water rights on the public's behalf. NRS 533.025 (emphasis added).

"The term 'water right' means generally the right to divert water by artificial means for beneficial use . . . ." *Application of Filippini*, 66 Nev. 17, 21, 202 P.2d 535, 537 (1949). The types of water rights recognized in Nevada may be thought of as two groups: (1) prestatutory "vested" rights that existed under common law prior to 1913, which may not be impaired by statutory law, and (2) statutorily granted rights, which include permitted and certificated rights. *See Andersen Fam. Assocs. v. Hugh Ricci, P.E.*, 124 Nev. 182, 188-89, 179 P.3d 1201, 1204-05 (2008). Relevant here, "vested water rights are subject to regulation under Nevada's statutory system, [but] such regulation may not impair the quantity or value of those rights." *Id.* at 190, 179 P.3d at 1206.

*The State Engineer has authority to delineate the LWRFS as a single hydrographic basin for conjunctive management and joint administration*

"[T]he scope of the State Engineer's authority here is a question of statutory interpretation, subject to de novo review." *Wilson v. Pahrump Fair Water, LLC*, 137 Nev. 10, 14, 481 P.3d 853, 856 (2021). "The Legislature has established a comprehensive statutory scheme regulating the procedures for acquiring, changing, and losing water rights in Nevada." *Id.* at 13, 481 P.3d at 856. "The State Engineer's powers thereunder are limited to only those . . . which the legislature expressly or implicitly delegates." *Id.* (internal quotations omitted). "[F]or implied authority to exist, the implicitly authorized act must be essential to carrying out an express duty." *Stockmeier v. State, Bd. of Parole Comm'rs*, 127 Nev. 243, 248, 255 P.3d 209, 212 (2011).

*The State Engineer has implied authority under NRS 533.085 to create the LWRFS and to determine the maximum amount that can be pumped*

NRS 533.085 prohibits the impairment of vested water rights, regardless of the source of the water.[5] *See Andersen Fam. Assocs.*, 124 Nev. at 190, 179 P.3d at 1206. All statutorily granted water rights in Nevada are given subject to existing rights. NRS 533.030 ("Subject to existing rights . . . all water may be appropriated for beneficial use . . . ."); NRS 534.020 ("All underground waters . . . subject to all existing rights to the use thereof, are subject to appropriation for beneficial use only under the laws of this State relating to the appropriation and use of water and not otherwise."). Because vested water rights by definition exist prior to the grant of statutorily granted water rights, all statutory rights are granted subject to vested rights, and no statutorily granted water right may impair vested water rights.

Rights under the Muddy River Decree are prestatutory vested rights under the protection of NRS 533.085 because the rights were appropriated before 1913. In order to protect prestatutory vested rights from impairment, the State Engineer must be able to determine the extent of the groundwater resource that feeds the Muddy River to determine which users are pumping from it and how much. *See Rasmussen v. Moroni*

---

[5]NRS 533.085(1) states,

> Nothing contained in this chapter shall impair the vested right of any person to the use of water, nor shall the right of any person to take and use water be impaired or affected by any of the provisions of this chapter where appropriations have been initiated in accordance with law prior to March 22, 1913.



*Irrigation Co.*, 189 P. 572, 577 (Utah 1920) ("When therefore all of the water is appropriated by a prior appropriator which flows in a given stream at some point some distance down said stream, such appropriator acquires a right to all of the sources of supply of such stream whether visible or invisible, or whether underneath or on the surface."). The State Engineer concluded that the best available science, as presented at the Order 1309 hearing, established that the basins in the LWRFS all share the same, interconnected source of water. The State Engineer must then have the authority to determine the maximum amount that can be pumped from the LWRFS as a whole in order to determine whether water is available for further appropriation and to protect the flow of water to senior vested rights.[6] Therefore, in determining the amount of unappropriated water in the LWRFS and in accounting for the impact on the source of water, the State Engineer has the implied authority to conjunctively manage surface and groundwater and to jointly administer across multiple basins based on the interconnected source of water that flows to vested rights holders.

NRS 533.085 gives the State Engineer the statutory authority to conjunctively manage surface waters with groundwater. If statutory rights holders deplete groundwater resources such that the flow of water to the elevated springs that feed the Muddy River is reduced to the point of impairing vested rights, then the State Engineer has the authority to invoke NRS 533.085 to protect vested rights. *Cf. Andersen Fam. Assocs.*, 124 Nev.

_____

[6]We do not determine at this time exactly how the State Engineer is to manage previously granted appropriation rights throughout the sub-basins in the LWRFS, or whether he can apply a pump cap to individual users, as those issues are not before us.

at 191, 179 P.3d at 1206 (stating that "a loss of priority can amount to a de facto loss of rights depending on water flow").

We likewise decline to hold that NRS 533.085 solely applies within a single previously delineated basin and cannot extend across multiple basins regardless of the location of the supply of water. Without this authority, junior rights holders could deplete the shared water resource according to their local priority and previously granted appropriation, regardless of the impact such appropriation has on vested rights holders outside of the local basin. This result would be contrary to both NRS 533.085 and the prior appropriation doctrine because it could impair the most senior prestatutory vested rights that rely on this supply of water. *See Andersen Fam. Assocs.*, 124 Nev. at 191, 179 P.3d at 1206; *see also Proctor v. Jennings*, 6 Nev. 83, 87 (1870) ("Priority of appropriation, where no other title exists, undoubtedly gives the better right.").

We further note the legislative policy declarations set forth in NRS 533.024(1)(c) and (e), which require the State Engineer to "consider the best available science in rendering decisions concerning the available surface and underground sources of water" and "[t]o manage conjunctively the appropriation, use and administration of all waters," support our interpretation. If the best available science indicates that groundwater and surface water in the LWRFS are interrelated and that appropriations from one reduces the flow of the other, then the State Engineer should manage these rights together based on a shared source of supply. Since the State Engineer must have the ability to conjunctively manage and jointly administer water across multiple basins in order to prevent the impairment of senior vested rights under NRS 533.085, we hold that he has the implied statutory authority to do so.



*The State Engineer also has authority to issue Order 1309 pursuant to a multitude of other statutory provisions*

Appellants point to a multitude of other statutory authority, including but not limited to NRS 534.080(1), NRS 533.370(2), NRS 534.030, NRS 534.110(6), NRS 534.110(3), and NRS 534.120, that give the State Engineer the power to conjunctively manage and jointly administer the subject basins. Respondents assert that no statute authorizes the State Engineer to redefine, combine, or delineate previously established basins into a new superbasin. We take this opportunity to interpret each statute in turn in order to clarify the State Engineer's authority to conjunctively manage and jointly administrate water.

Under NRS 534.080(1), the right to appropriate groundwater can be obtained only by complying with the provisions of NRS Chapter 533 "pertaining to the appropriation of water." NRS Chapter 533 addresses both surface water and groundwater, and several provisions implicitly require conjunctive management and joint administration. NRS 533.030(1) makes the appropriations of "all water" "[s]ubject to existing rights." Thus, any appropriation granted under NRS 534.080(1) is subject to existing surface water and groundwater rights. Any appropriation of groundwater under NRS 534.080(1) is likewise subject to nonimpairment of vested rights under NRS 533.085 and is thus subject to conjunctive management and joint administration concepts based on a shared source of supply, as earlier discussed.

NRS 534.080(1)'s requirement to comply with NRS Chapter 533 also requires compliance with NRS 533.370(2). NRS 533.370(2) requires the State Engineer to reject applications for permitted water rights "where there is no unappropriated water in the proposed source of supply . . . *or where its proposed use or change conflicts with existing rights.*" (Emphasis

SUPREME COURT
OF
NEVADA

(O) 1947A

added.) We previously interpreted NRS 533.370(2) in *Eureka County v. State Engineer*, 131 Nev. 846, 856, 359 P.3d 1114, 1121 (2015), and held that the State Engineer must consider the effect that groundwater appropriations have on spring discharge. There, we determined that new groundwater appropriations that deplete springs were a "conflict" for the purposes of NRS 533.370(2). *Id.* at 852, 359 P.3d 1118. Although we did not use the term "conjunctive management," it is clear the concept was recognized in that caselaw. *See id.*; *see also Cappaert*, 426 U.S. at 142 (noting that "Nevada itself may recognize the potential interrelationship between surface and groundwater since Nevada applies the law of prior appropriation to both").

We next turn to NRS 534.030 and NRS 534.110(6). NRS 534.030(1) and (2) give the State Engineer authority to designate an area as a "basin" for the purposes of further administration, and NRS 534.110(6) gives him authority to "conduct investigations in any basin or portion thereof" where replenishment appears inadequate and to restrict withdrawals to conform to priority rights. To determine whether these statutes support Order 1309, we must first determine the definition of "basin" as used in these statutes.

The State Engineer asserts that "basin" is broad and inclusive, and thus may include an aquifer and multiple previously delineated topographical basins. In its ruling, the district court narrowly defined "basin" as the 253 hydrographic areas originally established by the United States Geological Survey (USGS), which was adopted and published on a map by Nevada's Division of Water Resources in 1968. *See* NRS 532.170 (the State Engineer is authorized to enter into agreements with the USGS for "investigations related to the development and use of the water



resources of Nevada"); Eugene F. Rush, *Water Resources Information Series, Report 6, Index of Hydrographic Areas in Nevada*, Nevada Department of Conservation and Natural Resources, Division of Water Resources (1968), http://images.water.nv.gov/images/publications/Information%20series/6.pdf (Rush Report). We disagree with the district court's interpretation that "basin" refers only to the 253 hydrographic areas or topographical "sub-basins," and we hold that "basin" includes the meaning the State Engineer ascribes to it.

"[A]n agency charged with the duty of administering an act is impliedly clothed with power to construe it as a necessary precedent to administrative action." *State v. Morros*, 104 Nev. 709, 713, 766 P.2d 263, 266 (1988) (internal quotations omitted). However, this court will only "defer to an agency's interpretation of its governing statutes . . . if its interpretation is *reasonable*." *Pub. Emps.' Ret. Sys. of Nev. v. Nev. Pol'y Rsch. Inst., Inc.*, 134 Nev. 669, 673 n.3, 429 P.3d 280, 284 n.3 (2018).

Although used throughout NRS Chapters 532, 533, and 534, "basin" is not defined by statute. *See, e.g.*, NRS 534.030(1)(b) (describing the State Engineer's procedure to "designate the area by basin" for the purposes of administration); *see generally* NRS Chapters 532-534 (leaving "basin" undefined). The State Engineer's interpretation of "basin" reasonably fits within a dictionary definition as "an enclosed or partly enclosed water area" or "a broad area of the earth beneath which the strata dip [usually] from the sides toward the center." *See Basin, Merriam-Webster's Collegiate Dictionary* 102 (11th ed. 2003). Further, statutes containing the word "basin" expressly contemplate underground water and thus should not be limited to solely a surface level or topographical meaning. *See* NRS 534.030(2) and (5) (discussing "groundwater basin[s]");

 

NRS 534.110(6) (stating the State Engineer "shall conduct investigations in any basin" where "the average annual replenishment to the groundwater supply may not be adequate").[7]

The State Engineer is charged with the duty of administering and construing his statutory authority and his interpretation is reasonable. *See Morros*, 104 Nev. at 713, 766 P.2d at 266. Therefore, "basin" as used by the State Engineer in water law may include an "aquifer" and may include multiple previously delineated basins as sub-basins.

Turning to NRS 534.110(6), it states in pertinent part,

> [T]he State Engineer shall conduct investigations in any basin or portion thereof where it appears that the average annual replenishment to the groundwater supply may not be adequate[,] . . . and if the findings of the State Engineer so indicate, . . . the State Engineer may order that withdrawals . . . be restricted to conform to priority rights . . . .

---

[7]We likewise disagree with the district court's conclusion that "basin" is singular and that management of water was only authorized on a sub-basin within a basin approach. While this interpretation of basin as singular is a permissive way to manage water, it is not exclusive of the plural management of multiple basins. *See* NRS 0.030(1) ("Except as otherwise expressly provided in a particular statute or required by the context[,] . . . [t]he singular number includes the plural number, and the plural includes the singular."). Nor in context does the meaning of "basin" require the individual management of sub-basins and yet prohibit management of a larger basin composed of sub-basins.

(O) 1947A

"[W]hen statutory language is clear and unambiguous, the court will not look beyond its plain meaning and will give effect to its apparent intent from the words used, unless that meaning was clearly not intended." *Andersen Fam. Assocs.*, 124 Nev. at 187, 179 P.3d at 1204 (internal quotations omitted). NRS 534.110(6) is clear and unambiguous: the State Engineer shall conduct investigations in a basin or any portion where the groundwater replenishment may not be adequate for all permittees and all vested-right claimants and may order restrictions based on those findings.

In order to investigate a basin and determine if the replenishment to the groundwater supply is adequate, the State Engineer must be able to determine the boundaries of the basin that contains the groundwater supply, the boundaries of the area that replenishes the basin, and the rate of replenishment. *See* NRS 534.110(6); *Stockmeier*, 127 Nev. at 248, 255 P.3d at 212 ("[F]or implied authority to exist, the implicitly authorized act must be essential to carrying out an express duty."). "Basin," as discussed, may mean a large area and include aquifers or an area with multiple basins that share the same source of interconnected groundwater supply. We hold that NRS 534.110(6) gives the State Engineer the implied authority to make a factual finding as to the boundaries of the LWRFS and determine the maximum amount that can be pumped from the LWRFS without reducing the supply of groundwater.[8] He may then delineate the boundary of the basin for administration under NRS 534.030. All of this requires conjunctive management and joint administration.

---

[8]The factual findings in Order 1309 do not by themselves re-prioritize the rights of individual permittees, and Order 1309 revoked the portions of Interim Order 1303 that re-prioritized rights.

The State Engineer also has the express statutory authority to make the factual finding that the "area affected" by new appropriations is broader than a previously defined basin. NRS 534.110(3) states, "The State Engineer shall determine whether there is unappropriated water in the area affected and may issue permits only if the determination is affirmative." An "area affected" as used in NRS 534.110(3) is not limited to "aquifer" or "basin," because "aquifer" is used at NRS 534.110(2), and "basin" is used at NRS 534.110(6)-(8). *Andersen Fam. Assocs.*, 124 Nev. at 187-88, 179 P.3d at 1204 (stating "no statutory language should be rendered mere surplusage if such a consequence can properly be avoided"). The State Engineer must delineate the "area affected" to determine whether there is unappropriated water in the "area" in order to protect prior existing water rights. *See* NRS 533.030(1); *see also* NRS 533.085.[9]

> Finally, we turn our attention to NRS 534.120(1), which states,

> Within an area that has been designated by the State Engineer, as provided for in this chapter, where, in the judgment of the State Engineer, the groundwater basin is being depleted, the State Engineer in his or her administrative capacity may make such rules, regulations and orders as are deemed essential for the welfare of the area involved.

We hold that the plain language of this statute supports the State Engineer's authority to issue Order 1309 in the six previously designated basins. NRS 534.120(1) is silent as to the specific ability of a State Engineer to redraw boundaries or group basins together. However,

---

[9]We note that the State Engineer has already effectively used this authority to protect existing rights holders throughout the LWRFS, including respondents, by denying applications for appropriations based on the results of Order 1169.

the clause enabling the State Engineer to "make such rules, regulations and orders as are deemed essential for the welfare of the area involved" is a broad delegation of authority, one that encompasses the creation of the LWRFS out of multiple sub-basins for future management and determining the maximum amount of water that can be pumped.[10]

We disagree with respondents' argument that an area must be designated as a critical management area under NRS 534.110(7) before the State Engineer is authorized to make orders under NRS 534.120(1). There is no indication that an "area" in NRS 534.120(1) has the exact same meaning as a "critical management area" under 534.110(7). Additionally, it would be illogical and unreasonable to require the State Engineer to define a "critical management area" without first making a factual finding as to the boundaries of the area containing groundwater.

*The State Engineer has the implied authority to determine the boundaries of the source of water in order to protect the Moapa Dace against future appropriations*

Finally, we turn to the statutory arguments regarding the protection of the Moapa Dace. Appellants assert that delineation of the LWRFS boundary was necessary to protect the State of Nevada from liability under the federal Endangered Species Act (ESA) for failing to protect the endangered Moapa Dace from groundwater pumping, citing NRS 533.367 and NRS 533.370(2). Respondents assert that the State Engineer lacks the authority to combine multiple basins in order to protect an endangered species and that the plain language of NRS 533.367 and

---

[10]Because Kane Springs was not previously designated a basin for administration, the State Engineer may not rest on his authority in NRS 534.120(1) to issue orders in that area and must instead rely on the previously discussed statutory authority.

NRS 533.370(2) does not provide the State Engineer with the authority to manage existing water rights.[11]

NRS 533.367 states in pertinent part that "[b]efore a person may obtain a right to the use of water from a spring or water which has seeped to the surface of the ground, the person must ensure that wildlife which customarily uses the water will have access to it." Although the plain language of this statute places the onus on the person seeking the right to use water, there is no way for a person to know how much water they can take without impeding "access" to wildlife such as fish without first obtaining information on the flow of water from the source of supply from the State Engineer. Thus, NRS 533.367 impliedly requires the State Engineer to determine the amount of water in the source of supply to springs or seeps, in order to determine how much water can be drawn.

NRS 533.370(2) similarly provides that the State Engineer shall reject applications "where there is no unappropriated water in the proposed source of supply" or that "threaten[ ] to prove detrimental to the public interest." Both of these statutes require the State Engineer to determine the amount of water "in the proposed source of supply" in order to determine if an application would be a threat to the public interest.[12] The

---

[11]Respondents also assert that the Moapa Dace is already protected via a variety of agreements the parties entered into with the federal government. We note that not all of the appellants, and in particular the State Engineer, are party to all of the agreements cited; thus the Moapa Dace may not be fully protected by preexisting agreements.

[12]Neither of these statutes, however, permits the impairment of already existing rights in order to protect the Moapa Dace or avoid ESA liability.

preservation of wildlife is part of the public interest. *See Pyramid Lake Paiute Tribe of Indians v. Washoe County*, 112 Nev. 743, 752, 918 P.2d 697, 702 (1996) (discussing whether the potential impact from pumping would impact wildlife and thus be detrimental to the public interest). The State Engineer has implied authority to make a factual determination as to the boundaries of the source of water in order to make determinations on new applications for appropriations.[13]

*There is no due process violation because respondents received notice and had an opportunity to be heard on the State Engineer's order*

Respondents assert that they lacked notice of the topics of the Order 1309 hearing and were not afforded a full and complete opportunity to address the implications of the State Engineer's decision to subject the basins to conjunctive management and joint administration. We review "constitutional challenges de novo, including a violation of due process rights challenge." *Eureka County v. Seventh Jud. Dist. Ct.*, 134 Nev. 275, 279, 417 P.3d 1121, 1124 (2018). "In Nevada, water rights are 'regarded and protected as real property.'" *Id.* (quoting *Application of Filippini*, 66 Nev. 17, 21-22, 202 P.2d 535, 537 (1949)). "Both the United States Constitution and the Nevada Constitution guarantee that a person must receive due process before the government may deprive him of his property." *Callie v. Bowling*, 123 Nev. 181, 183, 160 P.3d 878, 879 (2007). "Procedural due process requires that parties receive notice and an

---

[13]We note that the State Engineer's 8,000 afa pump cap does not reference the Moapa Dace and is not yet applied. We decline to extend our ruling to address whether the State Engineer may apply a pump cap for the benefit of an endangered species because that issue is not before us.

opportunity to be heard." *Eureka County*, 134 Nev. at 279, 417 P.3d at 1124 (internal quotations omitted). Due process attaches when there is even the "possible outcome" of curtailment; thus water rights holders must be noticed. *Id.* at 279-80, 417 P.3d at 1125.

Apart from respondents in Kane Springs Valley, all respondents were afforded adequate notice, through Interim Order 1303, of the topics of the Order 1309 hearing. Interim Order 1303 contemplated all of the issues under contention in Order 1309. Thus, respondents other than those from Kane Springs Valley received constitutionally adequate notice.

With regard to the respondents with wells in Kane Springs Valley, their inclusion in the Order 1309 hearing was not contemplated in Interim Order 1303. They likewise did not participate in the Order 1169 pump test. However, Kane Springs Valley respondents participated in the administrative hearing due to a request from the SNWA to the State Engineer to consider including Kane Springs in the Order 1309 hearing and the LWRFS in late 2018. The record also reflects that the Kane Springs Valley respondents received over one month of formal notice of the potential inclusion of Kane Springs Valley, with time allotted for a presentation through a Notice of Hearing dated August 23, 2019. Thus, all of the respondents received constitutionally adequate notice.

We likewise hold that all of the respondents had an adequate opportunity to be heard on the factual issues. There are no policy or management issues resolved in Order 1309 such that respondents needed the opportunity to be heard on those issues. No deprivation of priority property rights occurred because Order 1309 rescinded the portion of Interim Order 1303 that reordered priority rights. Additionally, there was

no loss of flow to any respondent as a result of Order 1309, much less the "possible outcome" of curtailment, because the findings of the State Engineer were purely factual. The Order 1309 hearing resulted in factual findings as to the boundaries of the LWRFS and the maximum amount of water that could be pumped, and the State Engineer did not consider capping or curtailing any individual user as a result of the hearing. Further, the record is clear that all respondents, including the Kane Springs Valley respondents, were able to provide meaningful input on the factual issues at the administrative hearing.[14] *Cf. Sw. Gas Corp. v. Pub. Utils. Comm'n of Nev.*, 138 Nev. 37, 46, 504 P.3d 503, 511-12 (2022) (holding the due process claims failed because the issue was raised in the prefiled direct testimony, providing notice that the issue would be considered, and the appellant was afforded the opportunity to argue against it at the hearing). Any findings regarding the maximum amount that can be pumped from the LWRFS were not contemplated for the actual management of individual users and were instead made for future proceedings.[15]

---

[14]Respondent Nevada Cogeneration Associates Nos. 1 and 2 asserts that the State Engineer violated due process by improperly shifting the burden of proof regarding the delineation of the boundary for the LWRFS. We conclude there was no such burden shifting.

[15]We note that the inclusion of Kane Springs Valley and part of the Black Mountain Area appears to be in part for the opportunity to conduct additional studies on their hydrologic connection to the LWRFS. This appears to be an acknowledgment from the State Engineer that the parties raised factual issues that merit further study, which further strengthens our holding that there was sufficient opportunity to be heard.

Finally, appellants assert that the district court erred when it held that the State Engineer violated respondents' due process rights by not disclosing the criteria he used to evaluate hydrologic connections before the Order 1309 hearing. Respondents assert that the State Engineer failed to give notice of the six criteria he used for determining the boundary of the new basin.

The "opportunity to be heard" is "a right that includes the ability to challenge the evidence upon which the State Engineer's decision may be based." *Eureka County v. State Eng'r*, 131 Nev. 846, 855, 359 P.3d 1114, 1120 (2015). "The Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974)). However, the Due Process Clause does "not preclude a factfinder from observing strengths and weaknesses in the evidence that no party identified." *Bowman Transp., Inc.*, 419 U.S. at 288 n.4.

Here, respondents are not alleging that they lacked access to the underlying data or the factual issues; rather, they assert that they did not have access to the State Engineer's method of interpreting, analyzing, and weighing facts prior to the hearing. The Due Process Clause does not require the State Engineer to explain how he will analyze and weigh evidence prior to the evidence being submitted at a hearing. *See id.* Therefore, the district court erred by finding violations of due process.

## CONCLUSION

The State Engineer did not exceed his statutory authority in issuing Order 1309. The State Engineer has statutory authority to combine multiple basins into one hydrographic "superbasin" based on a shared source of water. Additionally, respondents' due process rights were not violated because they received notice and had the opportunity to be heard at the Order 1309 hearing. Accordingly, we reverse the district court's order granting respondents' petitions for judicial review. For the same reason, we reverse the district court's order dismissing MVIC and CBD's petitions for judicial review and reverse the district court's order to the extent it dismissed in part SNWA's petition for judicial review, directing the district court to grant those petitions insofar as they assert the State Engineer has the statutory authority to make the findings in Order 1309.

Additionally, we agree with appellants SNWA, MVIC, and the State Engineer that the adjudication of an absence of conflict between current groundwater pumping and rights under the Muddy River Decree exceeded the scope of the hearing notice. We therefore affirm the district court's decision to the extent it granted SNWA's petition and reverse the dismissal of MVIC's petition, directing the district court to grant it in part on remand. We remand for the district court to continue its review under NRS 533.450 to determine whether substantial evidence supports Order 1309 and for further proceedings in accordance with this opinion. We likewise lift our Order Granting Stay filed October 3, 2022.

 

Finally, we do not reach the issue of attorney fees in Docket No. 85137 because our decision in this matter renders the issue moot. *See Personhood Nev. v. Bristol*, 126 Nev. 599, 602, 606, 245 P.3d 572, 574-75 (2010) (dismissing appeal where subsequent events rendered the case moot).

_____, J.
Lee

We concur:

_____, C.J.
Cadish

_____, J.
Stiglich

_____, J.
Pickcring

_____, J.
Herndon

_____, J.
Parraguirre

_____, J.
Bell

SUPREME COURT
OF
NEVADA

(O) 1947A